## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**JILL HENDERSON, ET AL.**

**VERSUS**

**BOARD OF SUPERVISORS OF SOUTHERN UNIVERSITY AND A&M COLLEGE, ET AL.**

**CIVIL ACTION**

**NO. 21-297-JWD-RLB**

### RULING AND ORDER

This matter comes before the Court on the second *Motion to Dismiss Under Rule 12(B)(6)* (the "*Motion*") (Doc. 20) filed by Defendants the Board of Supervisors of Southern University and A&M College ("Southern"); Herman Brister, Jr., individually and in his official capacity as director of the Southern Laboratory School ("Brister"); and Renita Sherrard, individually and in her official capacity as assistant principal of the Southern Laboratory School ("Sherrard") (collectively, "Defendants"). Plaintiffs Justin Thompson ("Thompson") and Jill Henderson ("Henderson") (collectively, "Plaintiffs") oppose the motion. (Doc. 25.) Defendants filed a reply. (Doc. 28.) Oral argument is not necessary. The Court has carefully considered the law, the facts alleged in the *Supplemental, Amending, and Restated Complaint* (the "*Amended Complaint*") (Doc. 16), and the arguments and submissions of the parties and is prepared to rule.

For the following reasons, the *Motion* is granted with respect to Plaintiffs' claims for (a) discrimination in violation of Title IX based on deliberate indifference to sexual harassment against Southern, and (b) violation of Thompson's rights under the First and Fourteenth Amendments of the U.S. Constitution pursuant to 42 U.S.C. § 1983 against Brister and Sherrard. In all other respects, the *Motion* is denied.

### I.    Relevant Factual Background

1

This action arises from the alleged sexual harassment of Thompson while he was a high school student at the Southern University Laboratory School ("Southern Lab"). The following factual allegations are taken from Plaintiffs' *Amended Complaint*. (Doc. 16.)

Thompson attended Southern Lab during the 2020–2021 school year. (*Amend. Compl.* ¶¶ 2–3, Doc. 16.) On September 2, 2020, after receiving approval to graduate early, the school administrator advised him to reach out to the "Senior [Southern] Lab Government Association so that he could obtain access to Senior class information." (*Id*. ¶ 3.) Thompson then contacted another student, who added him to the senior class group text. (*Id.*) According to the *Amended Complaint*, the senior class group text was a "school sponsored mode of communication between Senior class students to exchange information about school sponsored activities, news, and/or duties for Senior class students." (*Id.*)

"Almost immediately" after joining this group text, "approximately twenty" students "subjected Mr. Thompson to unwelcome and unabated sexual harassment." (*Id*. ¶ 3a.) Unlike the original complaint, the *Amended Complaint* details specific texts it alleges constitute the harassment at issue, including the following messages from students:

a. Demanding to know whether Mr. Thompson was actually a homosexual and stating, in a derogatory manner, that it was "hard to believe" and a lie Mr. Thompson was not homosexual;

b. Asking other students in the thread what his/her "take" was and how he/she "felt" about whether Mr. Thompson was homosexual;

c. Publicly calling Mr. Thompson "gay", "gay n***a", and "sissy";

d. Discussing fantasy information regarding Mr. Thompson's sexual life, including with a female student and comparing Mr. Thompson to a homosexual meme of "SpongeBob Square Pants";

e. Posting derogatory pictures in reference to Mr. Thompson, including emojis of painted nails and smiley faces referencing Mr. Thompson as female and/or with other female traits;

    f.   Falsely accusing Mr. Thompson of performing homosexual acts on other student(s), that Mr. Thompson was allegedly going to "dog[]" another student "out";

    g.   Characterizing the harassment of Mr. Thompson as "bonding" between the Senior class;

    h.   Texting laughing face emojis and encouragement of derogatory comments about Mr. Thompson's sexual orientation; and

    i.   Threatening that students will "flip tf [the f***k]["] out because Mr. Thompson is homosexual.

(*Id*.) This "ruthless cyber bullying/sexual harassment continued for approximately two (2) hours" before Thompson removed himself from the group text, "thereby cutting off his access to all senior information and activities." (*Id*. ¶ 3b.)

On September 3, 2020, Thompson reported the harassment incident to Sherrard, Southern Lab's assistant principal. (*Id*. ¶ 4.) On September 7, 2020, Sherrard informed Thompson that she spoke with one of the students involved in the alleged harassment and "made the [student's] parents . . . aware of their child's involvement in the incident." (*Id*.) Following Thompson's report, the *Amended Complaint* states:

> [D]efendants failed to provide any additional relief to Mr. Thompson for the sexual harassment, provided no protection from the other students, and offered no effective counseling. While there was ultimately one (1) referral to a school guidance counselor, who was also the guidance counselor for the entire school, including the students who sexually harassed Mr. Thompson, that resulted in a single meeting. [Plaintiffs'] requests for ongoing counseling were denied by defendant, who instead, sent . . . Ms. Henderson a list of names for her to call and determine whether her health insurance for Mr. Thompson would be accepted.

(*Id*.)

On September 8, 2020, Thompson's mother, Henderson, contacted Brister, Southern Lab's director, to inquire about the investigation into the incident. (*Id*. ¶ 5.) Brister told Henderson that they had not yet investigated the incident, but that he "would contact her once he had done so."

(*Id.*) However, "defendants did not investigate the sexual harassment and, instead, through defendant Brister, falsely accused Mr. Thompson of instigating the sexual harassment, including to [Southern] Lab Human Resources and Ms. Henderson." (*Id.*)

Two days later, on September 10, 2020, Brister allegedly admitted to Plaintiffs that Defendants had " 'dropped the ball' by failing to take prompt remedial action to investigate and/or remedy the sexual harassment." (*Id.* ¶ 6.) However, the *Amended Complaint* maintains that Defendants "continued to falsely blame Mr. Thompson for instigating" the incident, that "Brister then insisted Mr. Thompson submit written documentation" of the sexual harassment and bullying allegations, and that Brister claimed Thompson's complaints were invalid because they were not in writing. (*Id.*) That same day, after learning from Sherrard that Thompson had reported the harassment, one of the students involved in the incident "face-time called Mr. Thompson and threatened him." (*Id.* ¶ 7.) Thompson's mother, Henderson, informed Brister of this threat, but no action was taken. (*Id.*)

Thereafter, the students at Southern Lab began online classes due to COVID-19 and returned to in-person classes approximately one month later, on October 5, 2020. (*Id.* ¶ 7a.) According to the *Amended Complaint*:

> Immediately upon his return, the sexual harassment continued against Mr. Thompson by the same minor students who previously sexually harassed him less than one (1) month earlier. Mr. Thompson was again publicly called "gay", openly assaulted by the students who yelled offensive statements about his sexual orientation at him in the hallways and in the presence of defendant SU Lab's employees and supervisors, including "faggot", "fruity", "sissy", and "homo". The sexual harassment was open and obvious occurring during school hours on SU Lab's campus with defendants' full and actual knowledge, including defendant Sherrod [sic] who was actually present. Yet, defendants took no action to stop the sexual harassment.
>
> The sexual harassment of Mr. Thompson went unchecked by defendants and occurred on an hourly basis throughout the school day, including when Mr. Thompson switched classes and during his lunch hour. Although Mr. Thompson

directly opposed the sexual harassment to the students and requested that the unwanted comments cease, the sexual harassment continued for the next four (4) days until defendants expelled Mr. Thompson in retaliation for his protected activities.

(*Id.* ¶¶ 7a–7b.)

On October 8, 2020, "a verbal altercation occurred between" Thompson and Tony Brown, a Southern Lab teacher who Plaintiffs maintain "had a close relationship with the students" who allegedly sexually harassed Thompson. (*Id*. ¶ 8.) Mr. Brown "yelled and cursed" at Thompson and allegedly "lunged at [him] in an attempt to hit him." (*Id.*) As a result, "and in contrast to Mr. Thompson's complaints[,]" Defendants "acted immediately" by escorting Thompson from the classroom. (*Id.*)

Several days later, on October 12, 2020, Brister informed Thompson that he had committed a "major infraction" in violation of "the Student Code of Conduct." (*Id.* ¶ 9.) Consequently, Thompson was then expelled and banned from school and all activities—including special activities related to the senior class—until further notice. (*Id*.) On October 14, 2020, Henderson—on behalf of her then minor son, Thompson—"filed a Title IX complaint against [Southern] Lab for allegations including, but not limited to, sexual harassment and retaliation." (*Id.* ¶ 12.)

Based on these events, Henderson[1] filed the instant suit in state court against Southern; Brister, individually and in his official capacity as director of Southern Lab; and Sherrard, individually and in her official capacity as assistant principal of Southern Lab. (*See* Doc. 1-2 at 1.) The case was removed to this Court on May 19, 2021. (Doc. 1.) Plaintiffs assert the following claims: (1) deliberate indifference to student-on-student sexual harassment and retaliation in violation of Title IX of the Educational Amendments of 1982, 20 U.S.C. § 1681, *et seq*., against

---

[1] At the time suit was originally filed, Thompson was still a minor. Thus, the sole plaintiff in this case was Thompson's mother, Henderson, who brought claims individually and on behalf of her then minor son. Because Thompson has since reached the age of majority, he is now a proper plaintiff in this suit.

Southern;[2] (2) violation of Thompson's rights under the First and Fourteenth Amendments of the U.S. Constitution pursuant to 42 U.S.C. § 1983 against Brister and Sherrard; and (3) violation of Thompson's right to privacy and confidentiality under Louisiana law against Sherrard. (*Amend. Compl.* ¶¶ 13–18, Doc. 16.)

Based on the claims asserted, Plaintiffs seek compensatory damages, punitive damages as to the individual defendants, attorney's fees, and all such other relief to which they are entitled. (*Id.* ¶¶ 1, 18–19.) Additionally, Henderson individually seeks damages for "loss of consortium, services, and society with her son," Thompson. (*Id.* ¶ 16.) Defendants now move to dismiss all of Plaintiffs' claims pursuant to Federal Rule of Civil Procedure 12(b)(6).

## II.    Rule 12(b)(6) Standard

"Federal pleading rules call for a 'short and plain statement of the claim showing that the pleader is entitled to relief,' Fed. R. Civ. P. 8(a)(2); they do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014) (citations omitted).

Interpreting Rule 8(a) of the Federal Rules of Civil Procedure, the Fifth Circuit has explained:

> The complaint (1) on its face (2) must contain enough factual matter (taken as true) (3) to raise a reasonable hope or expectation (4) that discovery will reveal relevant evidence of each element of a claim. "Asking for [such] plausible grounds to infer [the element of a claim] *does not impose a probability requirement* at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal [that the elements of the claim existed]."

---

[2] It was originally unclear in this case whether Plaintiffs asserted claims against individual defendants Brister and Sherrard for violating Title IX. (*See Amend. Compl.* ¶ 15, Doc. 16.) Plaintiffs have since clarified that Thompson does not assert any Title IX claims against Brister or Sherrard individually. (Doc. 25 at 2 n.1.) Therefore, to the extent Defendants move to dismiss the Title IX claims against Brister and Sherrard, the *Motion* is denied as moot.

*Lormand v. US Unwired, Inc.*, 565 F.3d 228, 257 (5th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (internal citations omitted)).

> Applying the above case law, the Western District of Louisiana has stated:

> Therefore, while the court is not to give the "assumption of truth" to conclusions, factual allegations remain so entitled. Once those factual allegations are identified, drawing on the court's judicial experience and common sense, the analysis is whether those facts, which need not be detailed or specific, allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." [*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)]; *Twombly*, 55[0] U.S. at 556. This analysis is not substantively different from that set forth in *Lormand, supra*, nor does this jurisprudence foreclose the option that discovery must be undertaken in order to raise relevant information to support an element of the claim. This standard, under the specific language of Fed. R. Civ. P. 8(a)(2), remains that the defendant be given adequate notice of the claim and the grounds upon which it is based. The standard is met by the "reasonable inference" the court must make that, with or without discovery, the facts set forth a plausible claim for relief under a particular theory of law provided that there is a "reasonable expectation" that "discovery will reveal relevant evidence of each element of the claim." *Lormand*, 565 F.3d at 257; *Twombly*, 55[0] U.S. at 556.

*Diamond Servs. Corp. v. Oceanografia, S.A. De C.V.*, No. 10-00177, 2011 WL 938785, at *3 (W.D. La. Feb. 9, 2011) (citation omitted).

In deciding a Rule 12(b)(6) motion, all well-pleaded facts are taken as true and viewed in the light most favorable to the plaintiff. *Thompson v. City of Waco, Tex.*, 764 F.3d 500, 502–03 (5th Cir. 2014) (citation omitted). The task of the Court is not to decide if the plaintiff will eventually be successful, but to determine if a "legally cognizable claim" has been asserted. *Id.* at 503.

**III.    Discussion**

**A.  Preliminary Note: Information Presented Outside the Pleadings**

At the outset, the Court will address Plaintiffs' argument that the *Motion* should be converted into one for summary judgment because of Defendants' reliance on two documents that were not attached to the *Amended Complaint*. The first exhibit is a complete copy of the group text

containing the allegedly discriminatory text messages other students sent to Thompson. (Def. Ex. A, Doc. 20-2.) The second exhibit is the Southern University Lab School Parent/Student Handbook. (Def. Ex. B, Doc. 20-3.)

As to the scope of what a court may consider while conducting a Rule 12(b)(6) analysis, this Court recently stated:

> The general rule regarding what may be considered in deciding a Rule 12(b)(6) motion is well known.

> "In determining whether a plaintiff's claims survive a Rule 12(b)(6) motion to dismiss, the factual information to which the court addresses its inquiry is limited to (1) the facts set forth in the complaint, (2) documents attached to the complaint, and (3) matters of which judicial notice may be taken under Federal Rule of Evidence 201." *Gomez v. Galman*, 18 F.4th 769, 775 (5th Cir. 2021) (per curiam) (quoting *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 735 (5th Cir. 2019)). *See also Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross & Blue Shield of Georgia, Inc.*, 892 F.3d 719, 726 (5th Cir. 2018).

> However, there is an exception to this rule: a court may consider documents attached to a motion to dismiss "where the complaint refers to the documents and they are central to the claim." *Kane Enters. v. MacGregor (USA) Inc.*, 322 F.3d 371, 374 (5th Cir. 2003) (citing *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000)). *See also Wilson v. GMFS LLC*, No. 18-840, 2019 WL 8301667, at *3 (M.D. La. May 24, 2019); *McCann v. Best Buy Co.*, No. 17-108, 2017 WL 5985570, at *2 (M.D. La. Dec. 1, 2017).

*Liberty Mut. Fire Ins. Co. v. Shaw Grp., Inc.*, No. 20-871, 2022 WL 896804, at *10 (M.D. La. Mar. 25, 2022) (deGravelles, J.).

The Court finds that it may properly consider both exhibits at issue for purposes of this ruling under the above-mentioned exception. First, both exhibits are attached to the *Motion*. (*See* Def. Ex. A, Doc. 20-2; Def. Ex. B, Doc. 20-3.) Additionally, Plaintiffs reference the content of both exhibits in the *Amended Complaint*. (*See Amend. Compl.* ¶¶ 3, 3a, 3b, Doc. 16 (discussing the text messages from other students sent in the group text); *see id.* ¶ 9 (referencing the "Student Code of Conduct," a complete recitation of which is set forth in Def. Ex. B, Doc. 20-3).)

Finally, both documents are also central to Plaintiffs' claims. More specifically, the group text, (Def. Ex. A, Doc. 20-2), is central to the claim that Southern discriminated against Thompson in violation of Title IX because the group text contains most of the alleged student-on-student harassment at issue. As discussed below, determining whether Plaintiffs have sufficiently stated a Title IX claim for deliberate indifference to sexual harassment based on the group text messages necessarily requires the Court to examine the actual messages sent therein to assess their severity, pervasiveness, and offensiveness.

Similarly, the school's Parent/Student Handbook, (Def. Ex. B, Doc. 20-3), is central to Plaintiffs' Section 1983 claim for violation of Thompson's Fourteenth Amendment right to equal protection. Specifically, Plaintiffs point out that Thompson was expelled and banned from school campus for "committing a 'major' infraction" under the Student Code of Conduct when he engaged in a verbal altercation with Mr. Brown. (*Amend. Compl.* ¶ 9, Doc. 16.) According to Plaintiffs, the non-homosexual students likewise committed "major" infractions in violation of the Student Code of Conduct when they allegedly sexually harassed Thompson in the group text, but they were treated differently from Thompson because they were neither expelled nor banned from school campus. (*Id.*) Thus, for the foregoing reasons, both exhibits are proper for the Court to consider in conducting its Rule 12(b)(6) analysis of Plaintiffs' claims.

### B.  Title IX Claims Against Southern

"There are two avenues to pursue a claim under Title IX: one based on an institution's official policy of intentional discrimination on the basis of sex and one that seeks to hold an institution liable for teacher-on-student or student-on-student sexual harassment." *Doe #1 v. Bd. of Supervisors of La. State Univ. & Agric. & Mech. Coll.*, No. 21-564, 2022 WL 16701930, at *12 (M.D. La. Nov. 3, 2022) (Dick, C.J.) (citations omitted). Plaintiffs proceed under the second theory

in this case. "Deliberate indifference to student on student harassment claims is considered an intentional violation of Title IX." *Id.* (citations omitted). "Retaliation for making a complaint of sex discrimination also constitutes intentional discrimination in violation of Title IX." *Id.* (citing *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005)). Plaintiffs assert claims for deliberate indifference to student-on-student harassment and retaliation in violation of Title IX, each of which will be addressed in turn.

### 1.   Deliberate Indifference to Student-on-Student Harassment

### a.   The Court's Prior Ruling

In the Court's prior ruling on Defendants' first Rule 12(b)(6) motion to dismiss, the Court extensively discussed the law applicable to Title IX claims for discrimination based on deliberate indifference to student-on-student sexual harassment and retaliation. *See Henderson v. Bd. of Supervisors of S. Univ. & A&M Coll.*, No. 21-297, 2022 WL 875592, at *3–7 (M.D. La. Mar. 23, 2022) (deGravelles, J.). As explained below, the Court ultimately found that Plaintiff[3] failed to allege facts sufficient to state a plausible claim under Title IX for either discrimination based on deliberate indifference or retaliation.

The Court first summarized the law applicable to Title IX discrimination claims based on deliberate indifference to student-on-student harassment:

> The Supreme Court has recognized that "student-on-student sexual harassment, if sufficiently severe, can . . . rise to the level of discrimination actionable under" Title IX. *Davis* [*v. Monroe Cnty. Bd. Of Educ.*], 526 U.S. [629,] 650 [(1999)]. A plaintiff suing a school district for student-on-student harassment under Title IX must show that: "the district (1) had actual knowledge of the harassment, (2) the harasser was under the district's control, (3) the harassment was based on the victim's sex, (4) the harassment was 'so severe, pervasive, and objectively offensive that it effectively bar[red] the victim's access to an educational opportunity or benefit,'

---

[3] At the time of this Court's prior ruling, Thompson was still a minor, and hence the sole plaintiff in this case was Thompson's mother, Henderson. Again, because Thompson has since reached the age of majority, he is now a proper plaintiff in this suit. The Court addresses this fact to clarify that, although its prior ruling mentions only "Plaintiff," the instant ruling deals with both Thompson and Henderson as "Plaintiffs."

and (5) the district was deliberately indifferent to the harassment." *Sanches* [*v.
Carrollton-Farmers Branch Indep. Sch. Dist.*], 647 F.3d [156,] 165 [(5th Cir.
2011)] (citing *Davis*, 526 U.S. at 650).

*Id.* at *4.

At the time of the Court's prior ruling, the only harassment alleged in the complaint
concerned the messages students sent in the group text; the complaint made no mention of any
bullying that occurred on school campus. As to the harassment through the group text, the Court
dismissed Plaintiff's discrimination claim under Title IX because it found that "Plaintiff ha[d] not
alleged sufficient facts to state a plausible claim that the students who harassed [Thompson] were
under Southern Lab's control, that [Thompson] endured sexual harassment that was severe and
pervasive, or that Southern Lab acted with deliberate indifference to the harassment." *Id.*

### b.  Parties' Arguments

Southern first points to the Court's prior ruling, wherein the Court found that the Title IX
discrimination claim for deliberate indifference failed under the second, fourth, and fifth elements
established in *Sanches*. (Doc. 20-1 at 6.) According to Southern, "Thompson's restated allegations
again fail for the same reasons as before." (*Id.*) As to the second element, which requires that the
student harassers be under Southern's control, Southern asserts that the *Amended Complaint*
"changes nothing" as to the group text claim because it does not allege that the text messages
occurred during school hours or on school grounds. (*Id.* at 7.) As to the other two disputed
elements, Southern largely repeats the findings from the Court's prior ruling, urging the Court to
reach the same conclusion here.[4] (*Id.* at 8–12.)

---

[4] Here, like with the first motion, the first and third elements of Plaintiffs' Title IX claim are not in dispute. (*See* Doc.
20-1 at 6.) More specifically, where the third element is concerned, Defendants concede that the derogatory comments
about Thompson's sexual orientation qualify as offensive and "sex-based" for purposes of Title IX. (Doc. 28 at 5.)

As to the four days of alleged on-campus harassment, Southern concedes that these allegations "might" meet the control requirement, but argues that they nevertheless should be dismissed because they fail to meet two of the remaining elements required for Plaintiffs' Title IX claim based on student-on-student harassment. Specifically, Southern maintains that the allegations concerning the four days of on-campus harassment amount to "nothing 'more than the sort of teasing and bullying that generally takes place in schools.' " (*Id.* at 10 (quoting *Sanches*, 647 F.3d at 167).) For this reason, Southern argues the on-campus harassment was not severe and pervasive enough to satisfy the fourth element. Finally, as to the fifth element, Southern argues that Plaintiffs' *Amended Complaint* still fails to show Southern and its administrators were deliberately indifferent to any of the harassment alleged. (*Id.*) Defendants additionally point out that, based on the allegations in the *Amended Complaint*, neither Thompson nor Henderson ever reported the on-campus harassment. (*Id.*)

In opposition to the *Motion*, Plaintiffs first argue that their allegations satisfy the control element because they have alleged that (a) the group text was "supervised and monitored directly by [Southern] Lab, through [Southern] Lab Teacher Tony Brown[;]" and (b) the on-campus sexual harassment "occurred in the hallways and at lunch" on school campus. (Doc. 25 at 13.) Next, Plaintiffs maintain that their allegations show the harassment was severe, pervasive, and objectively offensive enough to survive a Rule 12(b)(6) motion. According to Plaintiffs, "*Davis* requires a 'holistic view' of sexual harassment to determine its severity." (*Id.* at 14; *see also id.* (relying on *Harris v. Forklift Sys.*, 510 U.S. 17, 22 (1993), where the Supreme Court purportedly defined sexual harassment for purposes of Title VII as requiring courts to view the "cumulative effect" of each incident and whether they "combine to create a discriminatorily hostile or abusive work environment.").) Additionally, as to this fourth element, Plaintiffs argue they sufficiently

alleged the harassment barred Thompson from access to educational opportunities, "including being excluded from the group text which was the only source for school sponsored information and activities, inability to go from class to class and lunch without being targeted with sexually offensive [sic], and expulsion from school." (*Id.* at 16.)

Finally, Plaintiffs assert that they have alleged sufficient facts to meet the fifth element, which requires that Southern was deliberately indifferent to the sexual harassment. (*Id.*) Specifically, Southern was deliberately indifferent to the reported group text harassment and the on-campus harassment—which Plaintiffs allege Sherrard and other school employees witnessed—because it took no action to end the harassment or even investigate it. (*Id.* at 16–17.)

In reply, Southern largely repeats the arguments above. (*See* Doc. 28.) In addition, however, Southern avers that Plaintiffs misquote *Davis*, 526 U.S. 629 for the proposition that the Supreme Court requires a "holistic view" of the sexual harassment to determine severity, correctly pointing out that that term is not found in that case. (Doc. 28 at 5 n.14.) Moreover, Southern argues, even if courts were required to take a holistic view to determine the severity of the harassment for purposes of Title IX, the text messages in this case cannot be considered with the on-campus harassment because the text messages are not sufficiently alleged to be under the school's control. (*Id.* at 5.) Finally, in continuing its argument that the allegations do not sufficiently meet the severity element, Southern maintains that the cases relied on by Plaintiffs are either factually distinguishable or inapplicable because they deal with harassment in the workplace. (*Id.* at 5–7.)

### c.   Applicable Law and Analysis

As explained above, "[l]iability for student-on-student harassment under Title IX requires the claimant to prove each of five elements." *I.F. v. Lewisville Indep. Sch. Dist.*, 915 F.3d 360, 372 (5th Cir. 2019). Thus, for Plaintiffs' Title IX discrimination claim based on student-on-student

harassment to survive a Rule 12(b)(6) motion to dismiss, Plaintiffs must plausibly allege that: "(1) [The district] had actual knowledge of the harassment, (2) the harasser was under the district's control, (3) the harassment was based on the victim's sex, (4) the harassment was so severe, pervasive, and objectively offensive that it effectively bar[red] the victim's access to an educational opportunity or benefit, and (5) the district was deliberately indifferent to the harassment." *Id.* (quoting *Sanches*, 647 F.3d at 165 (citation and internal quotation marks omitted)).

Again, in previously ruling on the Title IX claim for deliberate indifference to student-on-student harassment, the Court considered in detail the allegations concerning the group text, but did not have before it the allegations of on-campus harassment. For this reason, and because the Court finds its prior ruling instructive on the sufficiency of the group text allegations here, the Court will bifurcate its analysis. First, concerning the group text, the Court will address whether the *Amended Complaint* has overcome the deficiencies detailed in its prior ruling. Thereafter, the Court will examine whether Plaintiffs have stated a viable claim for discrimination under Title IX based on deliberate indifference to the alleged on-campus harassment.

Having carefully considered the matter, and upon further consideration of the Court's prior ruling, the Court finds that Plaintiffs have failed to plausibly allege all five of the above-mentioned elements with respect to the allegations concerning the group text or the on-campus harassment. More specifically, as to the sexual harassment through the group text, the Court finds Plaintiffs failed to state a viable Title IX claim for discrimination based on deliberate indifference to student-on-student harassment because their allegations do not plausibly show that the district was deliberately indifferent to Thompson's report. As to the on-campus sexual harassment, the Court finds the *Amended Complaint* lacks sufficient factual allegations to satisfy the fourth *Sanches*

element—that is, that the sexual harassment "was so severe, pervasive, and objectively offensive that it effectively barred the victim's access to an educational opportunity or benefit." *Id.* (cleaned up). Accordingly, the *Motion* will be granted on this claim.

### a.  The Group Text

Again, in its prior ruling, the Court held that Plaintiffs failed to state a plausible claim because the complaint did not allege facts sufficient to show the second, fourth, and fifth elements of their claim for deliberate indifference to student-on-student harassment under Title IX. In sum, although the *Amended Complaint*'s new allegations certainly provide a stronger basis for the second and fourth elements of the Title IX claim here,[5] Plaintiffs have still failed to adequately plead the fifth element of their claim—that Southern Lab "was deliberately indifferent to the harassment." *Sanches*, 647 F.3d at 165.

On the issue of whether Southern Lab was deliberately indifferent to the sexual harassment of Thompson, the Court stated in its prior ruling:

> As explained by the Fifth Circuit: "Deliberate indifference is an extremely high standard to meet. Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference. Rather, a school district's response to the harassment or lack thereof [must be] clearly unreasonable in light of the known circumstances." *Ruvalcaba v. Angleton Indep. Sch. Dist.*, No. 20-40491, 2022 WL 340592, at \*5 (5th Cir. Feb. 4, 2022) (internal citations and quotation marks omitted). Furthermore, "[s]chools need not 'remedy the harassment or accede to a parent's remedial demands,' and 'courts should refrain from second-guessing the disciplinary decisions made by school administrators.' " *I.L. v. Houston Indep. Sch. Dist.*, 776 F. App'x 839, 842 (5th Cir. 2019) (quoting *Sanches*, 647 F.3d at 167–68).

---

[5] The Court observes that the harassment in the group text included one student calling Thompson a "gay n\*\*\*a." (*Amend. Compl.* ¶ 3a, Doc. 16.) In the context of a Title VI claim premised on a racially hostile environment arising from student-on-student harassment, the Fifth Circuit has recognized "that repeatedly 'being referred to by one's peers by the most noxious racial epithet in the contemporary American lexicon, [and] being shamed and humiliated on the basis of one's race' is harassment far beyond normal schoolyard teasing and bullying." *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 409 (5th Cir. 2015) (citation omitted). Hence, the Court acknowledges that use of this word would support a showing that the harassment was sufficiently severe, pervasive, and objectively offense if Plaintiffs' claim was premised on race-based harassment. However, Plaintiffs only assert claims for violation of Title IX based on Thompson's sex or sexual orientation, not based on his race.

*Henderson*, 2022 WL 875592, at *5.

With that framework in mind, this Court found that the allegations in the complaint failed to establish that Southern Lab's response to the harassment was clearly unreasonable in light of the known circumstances:

> Here, Plaintiff argues that Southern Lab was deliberately indifferent because Southern Lab failed to respond to J.T.'s harassment complaint with proper remedial action and failed to adequately investigate his allegations. (*See* Doc. 7 at 6.) In essence, Plaintiff contends that Southern Lab was "deliberately indifferent by taking no action." (*Id*.) Yet the Petition suggests that Southern Lab took at least some action, through its administrators, in response to J.T.'s complaint. For instance, four days after J.T. reported the incident to Assistant Principal Sherrard, she told J.T. that she spoke with a student involved in the harassment and informed the student's parents of the incident. (Doc. 1-2 at 2, ¶ 4.) Additionally, though on September 8, 2020, Director Brister told Plaintiff that he had not yet investigated the incident, later that evening, "Brister contacted Human Resources and accused J.T. of instigating the harassment," according to the Petition. (*Id*. at ¶ 5.) Furthermore, on September 10, 2020, Brister told Plaintiff he "dropped the ball" and "then insisted" that Plaintiff "submit written documentation" of the harassment and bullying allegations. (*Id*. at ¶ 6.)
>
> Granted, Defendants likely could have handled their investigative response to J.T.'s harassment allegations better and arguably, their response might even be characterized as "inept, erroneous, ineffective, or negligent." *See Ruvalcaba*, 2022 WL 340592, at *5. But Fifth Circuit precedent "makes it clear that negligent delays, botched investigations of complaints due to the ineptitude of investigators, or responses that most reasonable persons could have improved upon do not equate to deliberate indifference." *I.F. v. Lewisville Indep. Sch. Dist.*, 915 F.3d 360, 369 (5th Cir. 2019).

*Id.* at *6.

The same conclusion is warranted here. Plaintiffs' *Amended Complaint* repeats the same allegations: that Southern Lab was deliberately indifferent to the harassment because it "took no steps to investigate, end the sexual harassment, and/or protect" Thompson from the harassment. (*Amend. Compl.* ¶ 4, Doc. 16.) However, as explained above, Southern Lab did take some action through its administrators, including through the efforts of Sherrard. Additionally, the *Amended*

*Complaint* shows now that Southern Lab took other actions, including referring Thompson to a school guidance counselor and sending Henderson a list of names for her to call to determine whether health insurance for Thompson would be accepted. (*Id.*) That these actions may have been "inept, erroneous, ineffective, or negligent" in responding to the reported harassment is insufficient to satisfy the "extremely high standard" required to show deliberate indifference. *Ruvalcaba*, 2022 WL 340592, at *5 (citations omitted).

The *Amended Complaint* also adds that, contrary to Southern Lab's Title IX policy, Southern Lab "failed to provide any additional relief to Mr. Thompson for the sexual harassment, provided no protection from the other students, and offered no effective counseling." (*Amend. Compl.* ¶ 4, Doc. 16.) This allegation lends little support to Plaintiffs in showing Southern Lab was deliberately indifferent, as "even a school board's failure to follow its own internal policies is alone insufficient to establish deliberate indifference." *Kirkpatrick v. Sch. Bd. of Lafayette Par*., No. 20-01612, 2022 WL 2679605, at *2 (W.D. La. July 11, 2022) (citing *Sanches*, 647 F.3d at 169). Therefore, based on the reasons stated above, the Court finds that Plaintiffs failed to plead this element of their discrimination claim for deliberate indifference to student-on-student harassment. As a result, the Court need not address the remaining elements; Plaintiffs' Title IX claim for deliberate indifference to the sexual harassment perpetrated through the group text will be dismissed on this ground alone.

### b. The On-Campus Harassment

As to the alleged on-campus harassment, the Court finds that Plaintiffs have failed to state a viable Title IX discrimination claim for deliberate indifference to student-on-student harassment because their allegations, when taken as true, do not plausibly show the on-campus harassment was "so severe, pervasive, and objectively offensive that it effectively bar[red] the victim's access

to an educational opportunity or benefit[.]" *Sanches*, 647 F.3d at 165 (citing *Davis*, 526 U.S. at 650). Because Plaintiffs have not plausibly alleged facts sufficient to show this element of their claim, the Court need not address whether the remaining elements are met.

As stated above, the harassment must be "so severe, pervasive, and objectively offensive" that it effectively "deprive[s] the victims of access to the educational opportunities or benefits provided by the school." *Davis*, 526 U.S. at 650. "To satisfy this requirement, the harassment must have had a 'concrete, negative effect' on [the victim's] education." *Sewell v. Monroe City Sch. Bd.*, 974 F.3d 577, 585 (5th Cir. 2020) (quoting *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 410 (5th Cir. 2015)). Examples of a sufficiently negative impact on access to education include a "disparately hostile educational environment relative to [the victim's] peer[s], forcing the student to change his or her study habits or to move to another district, or lowering the student's grades." *Fennell*, 804 F.3d at 410 (internal citations, quotations, and alterations omitted). Other examples include "becoming homebound or hospitalized due to harassment" and "physical violence[.]" *Prendergast as Next Friends of L.P. v. Wylie Indep. Sch. Dist.*, No. 18-20, 2018 WL 6710034, at *8 (E.D. Tex. Dec. 4, 2018), *report and recommendation adopted*, No. 18-20, 2018 WL 6705536 (E.D. Tex. Dec. 20, 2018) (citing *Murrell v. Sch. Dist. No. 1, Denver, Colo.*, 186 F.3d 1238, 1248–49 (10th Cir. 1999) (being homebound or hospitalized); *Vance v. Spencer Cty. Pub. Sch. Dist.*, 231 F.3d 253, 259 (6th Cir. 2000) (physical violence)).

Here, upon returning to school campus, beginning on October 5, 2020, Plaintiffs allege that Thompson was bullied by the same students who had harassed him through the group text over a month earlier. (*Amend. Compl.* ¶ 7a, Doc. 16.) Specifically, they allege that Thompson was publicly called "gay," "faggot," "fruity," "sissy," and "homo" in the hallways at school, during school hours, and in the presence of Southern Lab's employees and supervisors, including

Sherrard, "who was actually present." (*Id.*) This bullying allegedly continued for the next three days, until Thompson was forced to leave campus due to his verbal altercation with his teacher on October 8, 2020. (*Id.* ¶¶ 7b, 8.)

Thompson was subsequently expelled from school on October 12, 2020. (*Id.* ¶ 9.) Plaintiffs further allege that, by being expelled, Thompson was denied opportunities to participate in school activities and was removed from dual enrollment, which added at least a semester to his college education. (*Id.*) Plaintiffs also allege that Thompson sustained damages for "embarrassment, humiliation, [and] severe mental anguish and emotional distress[.]" (*Id.* ¶ 16.) In their opposition, Plaintiffs clarify that they allege Thompson was denied access to an education as a result of the four days of on-campus harassment at issue because he had an "inability to go from class to class and lunch without being targeted with sexually offensive [comments], and" was subsequently expelled from school. (Doc. 25 at 16.)

The Court finds these allegations insufficient to show that the on-campus harassment effectively denied Thompson access to educational opportunities or benefits provided by the school. Even taking the allegations in the *Amended Complaint* as true, they do not show that the four days of bullying at school had a concrete, negative effect on Thompson's education. Plaintiffs do not allege that Thompson was forced to change his study habits or move to another district, was withdrawn from school because of the harassment, or that his grades declined as a result of the four days of bullying. *Fennell*, 804 F.3d at 410. Nor do Plaintiffs allege that Thompson suffered any physical harm or that he became "homebound or hospitalized" due to the harassment.[6] *Prendergast*, 2018 WL 6710034, at *8 (citations omitted).

---

[6] The same is true with respect to the sexual harassment Thompson was subjected to in the group text. Even if the cyberbullying and on-campus harassment together as a whole amounted to the severe, pervasive, and objectively offensive conduct contemplated by Title IX, Plaintiffs have still failed to allege that the sexual harassment barred Thompson's access to educational opportunities by having a concrete, negative effect on his education.

Although Plaintiffs allege that Thompson sustained damages in the form of embarrassment, humiliation, mental anguish, and emotional distress, the parties have not pointed to—and the Court is unable to locate—any authority recognizing that similar allegations, standing alone, are sufficient to show the harassment had a concrete, negative effect on the victim's education. *Cf. Fennell*, 804 F.3d at 410 (finding reasonable jurors could conclude that the plaintiffs were deprived of educational opportunities when one victim "suffered from anxiety *and* required alternative study arrangements," and the other two "were ultimately withdrawn from [that school district] and moved to another district.") (emphasis added); *see also Z. M-D. b/n/f Menzia v. Austin Indep. Sch. Dist.*, No. 19-991, 2020 WL 4550909, at *5 (W.D. Tex. Aug. 6, 2020) (finding the allegations showed a concrete, negative effect on the victim's education because he "had to be hospitalized for severe depression and suicidal ideation due to the harassment, and ultimately withdrew from [the school] entirely."); *see also Yarbrough v. Denton Indep. Sch. Dist.*, No. 420-433, 2021 WL 4704579, at *4 (E.D. Tex. Feb. 5, 2021) (finding the allegations sufficient to plead the harassment had a concrete, negative effect on the victim's education because he alleged, among other things, that he experienced anxiety and depression and was eventually withdrawn from the school district, but emphasizing that plaintiff "plausibly pleaded an example recognized by the Fifth Circuit: forcing a student to move to another district."); *see also Carabello v. N.Y.C. Dep't of Educ.*, 928 F. Supp. 2d 627, 643–44 (E.D.N.Y. 2013) (finding that no reasonable juror could conclude the victim was deprived of educational benefits when she had been diagnosed with PTSD and suffered from flashbacks and nightmares but had no evidence of declining grades or any other concrete, negative effect on her education); *see also Prendergast*, 2018 WL 6710034, at *8 (finding the allegations showed the victim's education was negatively impacted for Title IX purposes because he "suffered physical violence resulting in whiplash and severe emotional harm, showed signs of

post-traumatic stress disorder, and that [p]laintiffs felt they 'had no choice but to remove [him] from" his school); *cf. Sewell*, 974 F.3d at 585 (finding the allegations that the abuse by a school employee left the victim depressed, isolated, distraught, and traumatized were enough, but emphasizing that teacher-on-student harassment is more likely to support Title IX liability than is peer harassment). Thus, without more, the Court finds the allegations that Thompson suffered emotional harm are insufficient to plausibly show the four days of on-campus harassment had a concrete, negative effect on his ability to receive an education.

Furthermore, although Plaintiffs allege that, by being expelled, Thompson was denied opportunities to participate in school activities and was removed from dual enrollment, which added at least a semester to his college education, the allegations show that his expulsion occurred immediately after a verbal altercation between Thompson and one of his teachers. (*Amend. Compl.* ¶¶ 8–9, Doc. 16.) Plaintiffs seem to dispute whether the verbal altercation was the true reason Thompson was expelled, arguing instead that Thompson was expelled "in retaliation for his protected activities." (*Id.* ¶ 7.) Even accepting this legal conclusion as true, it still fails to sufficiently link Thompson's expulsion to the *harassment* at issue. "The *harassment* must have a 'concrete, negative effect' on [Thompson's] education," *Fennell*, 804 F.3d at 410 (quoting *Davis*, 526 U.S. at 654) (emphasis added), and Plaintiffs do not allege any concrete facts indicating Thompson's education was negatively affected as a result of the four days of bullying at school. Thus, even accepting Plaintiffs' allegations as true, they have failed to adequately plead the fourth *Sanches* element here. Accordingly, the Court will grant the *Motion* as it relates to Plaintiffs' Title IX claim for discrimination based on deliberate indifference to student-on-student harassment.

## 2.  Retaliation

### a.  Parties' Arguments

According to Southern, even with the additional allegations in the *Amended Complaint*, Plaintiffs have failed to adequately plead their claim for retaliation in violation of Title IX. First, Southern argues that the allegations fail to show the required but-for causation. (Doc. 20-1 at 12–14.) Then, Southern points to the new allegations that it began retaliating against Thompson by (1) "falsely accusing him of instigating the sexual harassment," (2) "disclosing that he complained of sexual harassment . . . ," (3) "invalidating Mr. Thompson's sexual harassment complaints for false reasons," and (4) "expelling him from school." (*Id.* at 13 (quoting *Amend. Compl.* ¶ 5, Doc. 16).) According to Southern, these additional allegations similarly fail to establish causation because Plaintiffs do not claim that the conduct was "very close" in proximity to Thompson's complaint about the cyberbullying. (*Id.*) In addition, Southern argues that "[i]nvestigating Thompson's complaint and contacting parents to discipline the student and stop further harassment are not retaliation." (*Id.*)

Alternatively, Southern maintains that—even if temporal proximity has been alleged—Plaintiffs still have not stated a plausible claim for retaliation:

> The amended complaint pleads no facts that explain *why* any defendant would have a reason to retaliate against Thompson for reporting *his peers'* private text messages. (And there is no allegation that the alleged on-campus harassment was ever reported, so there could be no retaliation as to unreported allegations). According to the amended complaint, Thompson's initial report had nothing to do with the conduct of any defendant and would have given them no reason to retaliate.

(*Id.* at 13–14; *see also id.* at 14 ("Discipline issued four days after an admitted 'verbal altercation' with a teacher is not plausibly retaliation for a complaint made about fellow students a month earlier.") (quoting *Amend. Compl.* ¶ 8, Doc. 16).)

In opposing the *Motion*, Plaintiffs aver that "causation is a question of fact and cannot be decided at the pleading stage." (Doc. 25 at 18.) To further support their retaliation claim, they rely

on *Wright v. Union Pacific R.R. Co.*, 990 F.3d 428, 433 (5th Cir. 2021), *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268 (2001), and *Wallace v. Seton Family of Hosps.*, 777 F. App'x 83, 90 (5th Cir. 2019), arguing that, when applied here, these cases show that the requisite causation has been adequately pled. (Doc. 25 at 18–19.) A more detailed explanation of these cases is provided below.

According to Plaintiffs, the *Amended Complaint* shows that Thompson suffered retaliation by Southern Lab for his protected activities all within the span of one month, because they allege that "after [Thompson] reported the sexual harassment by the students in the group message to [Southern] Lab on September 3, 2020, he was falsely accused of instigating the sexual harassment, his identity was disclosed as the complainant in violation of law, and his complaints were invalidated for false reasons within a span of seven (7) days (September 3, 2020, through September 10, 2020)." (*Id.* at 19.) Additionally, with respect to the on-campus harassment, Plaintiffs argue the allegations in the *Amended Complaint* show Thompson "engaged in protected activity for four (4) straight days by opposing the sexual harassment witnessed by [Southern] Lab directly to his harassers on October 5, 2020, through October 8, 2020." (*Id.*) Following Thompson's opposition to the alleged on-campus bullying, Southern Lab retaliated against him by removing him from school on October 8 and continued to retaliate against him by expelling him from school on October 12. (*Id.*)

In response, Southern attacks Plaintiffs' reliance on *Wright*, 990 F.3d 428 to show causation was adequately pled here. (Doc. 28 at 7–8.) According to Southern, that case is factually distinguishable because the Fifth Circuit did not deal with a situation like the case at hand, where Plaintiffs admitted Thompson was sent home as discipline after an altercation with a teacher. (*Id.*) Moreover, Southern maintains that—because Plaintiffs do not allege that Thompson ever reported the on-campus harassment—this new allegation cannot support a retaliation claim. (*Id.* at 8

(arguing that Southern could not have retaliated against Thompson for bullying that was never reported).)

### b. Applicable Law and Analysis

The Supreme Court has held that Title IX's private right of action encompasses claims of retaliation "where the funding recipient retaliates against an individual because he has complained about sex discrimination." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 171 (2005); *see Sanches*, 647 F.3d at 170 (a plaintiff bringing a Title IX retaliation claim "must show that the district or its representatives took an adverse action against her because she complained of harassment.") (citing *Jackson*, 544 U.S. at 174). "To establish a *prima facie* case of retaliation under Title IX, a plaintiff must show that (1) he engaged in a protected activity; (2) he was subjected to an adverse employment action, and (3) 'a causal link exists between the protected activity and the adverse employment action.' " *Trudeau v. Univ. of N. Tex., By and Through its Bd. of Regents*, 861 F. App'x 604, 607–08 (5th Cir. 2021) (per curiam) (quoting *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014)); *see also Collins v. Jackson Pub. Sch. Dist.*, 609 F. App'x 792, 795 (5th Cir. 2015) (per curiam) ("The language of the anti-retaliation provision of Title IX and that of Title VII are similar and 'should be accorded a similar interpretation.' " (citation omitted)); *see also Doe #1 v. Bd. of Supervisors of La. State Univ. & Agric. & Mech. Coll.*, 2022 WL 16701930, at *18 (explaining that, "since *Jackson*, the Fifth Circuit and district courts therein have held repeatedly that Title VII standards apply in evaluating Title IX retaliation claims.").

"Retaliation claims under Title IX are analyzed using the same burden-shifting framework applicable to Title VII retaliation claims." *Minnis v. Bd. of Sup'rs of La. State Univ. & Agric. & Mech. Coll.*, 55 F. Supp. 3d 864, 884 (M.D. La. 2014), *aff'd sub nom. Minnis v. Bd. of Sup'rs of*

24

*La. State Univ. & Agr. & Mech. Coll.*, 620 F. App'x 215 (5th Cir. 2015) (citations omitted). However, at the motion to dismiss stage, a claimant need not "prove" a prima facie case of retaliation, as the burden-shifting framework contemplates. Rather, the claimant is merely required to allege "sufficient facts to support a prima facie showing of retaliation." *Schaefer v. Peralta*, No. 16-17784, 2017 WL 6055153, at *4 (E.D. La. Dec. 7, 2017); *see also Cicalese v. Univ. of Tex. Med. Branch*, 924 F.3d 762, 766 (5th Cir. 2019) (emphasizing the distinction between the *McDonnell Douglas* evidentiary standard from pleading requirements).

### c. Protected Activity

For retaliation claims under Title VII, "opposing" a practice made unlawful under Title VII only constitutes protected activity if the employer had some notice of both the employee's opposition and the discriminatory nature of the conduct being opposed. *See, e.g., Allen v. Envirogreen Landscape Pros., Inc.*, 721 F. App'x 322, 326 (5th Cir. 2017), *as revised* (Dec. 7, 2017) (explaining that "[a] vague complaint or general allegation of unfair treatment, without any reference to an unlawful employment practice under Title VII, does not constitute protected activity."). A similar, if not the same, standard applies to retaliation claims under Title IX. *See Trudeau*, 861 F. App'x at 609 (discussing retaliation under Title IX and stating: "We have indeed held that there must be evidence that the decisionmakers had knowledge of his protected activity and that, absent such awareness, it cannot be said that the decisionmakers might have been retaliating against the plaintiff for having engaged in that activity.") (citation and internal quotations omitted).

Here, Plaintiffs claim Thompson engaged in protected activity in two ways: (1) by reporting the alleged sexual harassment in the form of cyberbullying to Southern Lab on September 3, 2020; and (2) by "directly oppos[ing]" the on-campus sexual harassment "to the

25

students" and requesting that those "unwanted comments cease[.]" (*Amend. Compl.* ¶ 7b, Doc. 16; *see also* Doc. 25 at 19.) The first instance clearly constitutes protected activity under Title IX. As for Thompson's opposition to the bullying at school, however, Southern argues that the retaliation claim falls short because Thompson never reported the on-campus harassment to the school or any school employee. (Doc. 28 at 8.)

While Southern is correct that Thompson never reported the four days of bullying at school, Plaintiffs allege that Defendants had "full and actual knowledge" of the on-campus sexual harassment, specifically because it (a) occurred on an hourly basis, including when he switched classes and during his lunch hour, (b) was "open and obvious" during school hours since students yelled offensive statements at him that derogatorily targeted his sexual orientation, and (c) occurred "in the presence of" assistant principal Sherrard and other Southern Lab employees and supervisors. (*Amend. Compl.* ¶¶ 7a–7b, Doc. 16.) Assuming these facts are true, as the Court must on a Rule 12(b)(6) motion to dismiss, the Court finds that Southern had notice of Thompson's opposition to the on-campus harassment based on Sherrard's alleged knowledge of the bullying at school. Therefore, the Court finds Plaintiffs have plausibly shown that their opposition to both instances of sexual harassment—the cyberbullying and on-campus harassment—constituted protected activity.

### d.  Adverse Action

Next, the Court must determine whether Plaintiffs' allegations show Thompson was subjected to an adverse action. *Trudeau,* 861 F. App'x at 607–08. "For a retaliation claim, an adverse employment action must be 'materially adverse,' such that it would 'dissuade[ ] a reasonable worker from making or supporting a charge of discrimination.' " *Williams v. Franciscan Missionaries of Our Lady Health Sys., Inc.*, No. 18-323, 2019 WL 1370871, at *5

26

(M.D. La. Mar. 26, 2019) (deGravelles, J.) (Title VII) (quoting *Burlington N. and Santa Fe. R.R. Co. v. White*, 548 U.S. 53, 68 (2006)).

Here, Plaintiffs allege that Southern retaliated against Thompson for his protected activities by: (1) Brister falsely accusing him of instigating the sexual harassment in the group text; (2) Sherrard disclosing that he complained of the group text harassment by speaking with one of the students involved and making that student's parents aware of their child's involvement in the incident; (3) invalidating his sexual harassment complaints for false reasons, specifically through Brister's insistence that Thompson submit written documentation of the group text harassment and Brister's allegedly false claims that Thompson's prior complaints were invalid for not being in writing; and (4) expelling him from school. (*Amend. Compl.* ¶¶ 4–6, Doc. 16.)

Thompson's expulsion from school is clearly an adverse action under the "materially adverse" standard established in *Burlington*, 548 U.S. at 68. While the question of whether the remaining instances of alleged retaliation constitute materially adverse actions is a closer call, for the reasons that follow, the Court finds that those too qualify as adverse actions for purposes of Title IX.

Again, the "materially adverse" standard set forth in *Burlington* guides this Court's analysis on whether the alleged retaliatory actions are sufficiently adverse. Applying that principle in the Title IX context, the relevant question is whether "a reasonable [student] would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable [student] from making or supporting a charge of discrimination." *Id.* (internal quotation marks and citations omitted). Expounding on this standard, the Supreme Court stated: "We speak of *material* adversity because we believe it is important to separate significant from trivial harms." *Id.* "We refer to reactions of a *reasonable* employee [or, as here, a reasonable student] because we

27

believe that the provision's standard for judging harm must be objective." *Id.* Finally, "[w]e phrase the standard in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances." *Id.* at 69. In other words, "[c]ontext matters." *Id.*

Construing the allegations in the *Amended Complaint* in a light most favorable to Plaintiffs, Brister falsely accusing Thompson of instigating the cyberbullying he was subjected to and his false claims that Thompson's prior complaints of the group text harassment were invalid because they were not in writing would almost certainly dissuade a reasonable student of any age from "making or supporting a charge of discrimination." *Id.* at 68. The context here further strengthens that conclusion. Thompson reported the group text harassment on September 3, 2020. (*Amend. Compl.* ¶ 4, Doc. 16.) Thereafter, he received no information about his complaints until about four or five days later when his mother reached out to Sherrard and Brister. (*Id.* ¶¶ 4–5.) Brister responded that the school had not yet investigated the incident, but then falsely accused Thompson of instigating the sexual harassment in the group text. (*Id.* ¶ 5.) After initially blaming Thompson for the incident, on September 10, 2020, Brister then falsely informed Plaintiffs that the prior complaints were invalid for not being in writing. (*Id.* ¶ 6.) These circumstances would likely deter an objectively reasonable student in Thompson's position from reporting to the school any further harassment he might be subjected to. Moreover, the Court is unwilling to say that falsely blaming a student of instigating bullying he was the target of and falsely claiming his reports of that bullying were invalid are "trivial harms." *Burlington*, 548 U.S. at 68.

The same conclusion is warranted with respect to Sherrard's alleged disclosure of Thompson's identity as the sexual harassment complainant to one of the students who participated in the cyberbullying. A reasonable student in Thompson's position would likely be dissuaded from ever complaining again for fear of facing further repercussions from his own peers. Not only is it

28

reasonable for a student in Thompson's position to fear backlash from his peers under these circumstances, but that is in fact what happened in this case. The allegations show that Sherrard's disclosure resulted in the other student threatening Thompson with harm. (*Amend. Compl.* ¶¶ 4, 7, Doc. 16.) Moreover, Title IX's federal regulations seem to recognize the adverse results that disclosure of a complainant's identity would have on the complainant: "The recipient must keep confidential the identity of any individual who has made a report or complaint of sex discrimination, including any individual who has made a report or filed a formal complaint of sexual harassment . . . ." 34 C.F.R. § 106.71(a). Therefore, the Court finds that Plaintiffs have plausibly shown that the alleged instances of retaliation in this case constitute materially adverse actions for purposes of their retaliation claim under Title IX.

### e.  Causation

Finally, as to the third element, causation, the Court determines whether Plaintiffs have alleged sufficient facts to show a "causal connection" between Thompson's protected activities and the alleged retaliatory acts of Southern. *See Garcia v. Pro. Cont. Servs., Inc.*, 938 F.3d 236, 241–43 (5th Cir. 2019). The applicable causation standard at the initial prima facie stage calls for less than the "but-for" causation requirement.[7] *Id.* (discussing the Supreme Court's directive in *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013) that Title VII retaliation claims must be proven according to traditional principles of but-for causation, but clarifying that "*Nassar*'s heightened but-for causation requirement applies *only* in the third step (the pretext stage) of the *McDonnell Douglas* framework" and not at the prima facie stage of the retaliation analysis)

---

[7] Preliminarily, the Court notes that, in its last ruling, the Court found that but-for causation was required at the motion to dismiss stage, relying on *Trudeau*, 861 F. App'x at 608 (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)). The Court also found that Plaintiff (at the time, only Henderson) had not satisfied the causation requirement because of insufficient temporal proximity. After carefully considering the matter, and for the reasons that follow, the Court now finds a different result is warranted.

(emphasis added); *see Young v. City of Philadelphia Police Dep't*, 651 F. App'x 90, 96–97 (3d Cir. 2016) (same) (citation omitted); *see also Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 251 (4th Cir. 2015) (same) (citation omitted). Plaintiffs argue that, because their allegations show a close temporal proximity between Thompson's protected activity and the adverse action against him, they have adequately pled the causal connection element. (Doc. 25 at 18–19.) The Court agrees.

"At the prima facie case, a plaintiff can meet his burden of causation simply by showing close enough timing between his protected activity and his adverse employment action." *Garcia*, 938 F.3d at 243. Granted, "[f]or temporal proximity to alone establish prima facie causation, it is required to be 'very close.' " *Wallace v. Seton Fam. of Hosps.*, 777 F. App'x 83, 91 (5th Cir. 2019) (quoting *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (listing cases)); *see also Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 808 (5th Cir. 2007) (citation omitted). For example, in *Garcia*, the Fifth Circuit found that the plaintiff established the causation prong for purposes of his prima facie case based solely on the two-and-a-half-month gap in time between the protected activity and adverse action. 938 F.3d at 243. In determining whether this temporal proximity was close enough to establish a causal connection, the Fifth Circuit explained:

> This court has previously held that a period of two months is close enough to show a causal connection. *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 994–95 (5th Cir. 2005). We have even suggested that four months is close enough. *Evans v. Cty. Of Houston*, 246 F.3d 344, 354 (5th Cir. 2001). The Supreme Court has since approvingly cited a case that held three months was insufficient to show causation. *See Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001). But Garcia's two-and-one-half-month period still fits comfortably within the time periods of both our case law and *Breeden* to establish causation. Accordingly, the district court erred in holding that Garcia failed to establish his prima facie case.

*Id.* Yet, in a different case, the Fifth Circuit concluded that "two and one-half months between the protected activity and the adverse employment decision, standing alone, [was] not within the 'very

close' proximity that is necessary to establish causation." *Besser v. Tex. Gen. Land Off.*, 834 F. App'x 876, 885 (5th Cir. 2020).

The Court need not discuss why the Fifth Circuit found two and a half months sufficiently close in one instance and not in another, as the gaps of time at issue in this case are all significantly shorter than two and a half months. Again, Plaintiffs allege that Southern retaliated against Thompson for engaging in activity protected by Title IX through four separate instances: (1) assistant principal Sherrard disclosing Thompson's identity as the complainant to one of the students who sexually harassed him, although it is unclear whether this disclosure occurred on September 7 or September 10 of 2020, (*Amend. Compl.* ¶¶ 4, 6, Doc. 16); (2) Brister falsely accusing Thompson of instigating the cyberbullying on September 8, 2020, (*id.* ¶ 5); (3) Brister falsely claiming to Thompson and his mother that Thompson's prior complaints were invalid for not being in writing on September 10, 2020, (*id.* ¶ 6); and (4) expelling Thompson from school on October 12, 2020, (*id.* ¶ 9).

The Court observes that, of the four instances of retaliation alleged, the only one that occurred after Thompson opposed the on-campus harassment was his expulsion. Commonsensically, Southern could not have retaliated against Thompson for activity he had not yet engaged in. Thus, the Court will address his two protected activities separately, beginning first with his report of the cyberbullying, and then with his opposition to the on-campus harassment.

The first time Thompson engaged in protected activity was on September 3, 2020, when he reported the sexual harassment in the group text. (*Id.* ¶ 4.) As the dates above show, the first three adverse actions occurred within a week of Thompson's initial report, and his expulsion occurred a little over a month after that report. Hence, there is certainly close enough temporal proximity between Thompson's first protected activity and all four instances of retaliation to

satisfy the causation prong for purposes of Plaintiffs' prima facie case under the relevant jurisprudence. *Garcia*, 938 F.3d at 243; *Besser*, 834 F. App'x at 885; *see also Santhuff v. United Parcel Serv., Inc.*, No. 17-1404, 2019 WL 4545610, at *24 (M.D. La. Sept. 19, 2019) (deGravelles, J.) (finding that the "two-year period" between the plaintiff's complaints and his subsequent discipline was "well beyond the four-month period usually found to be sufficient to establish causation").

The same result is warranted with respect to Thompson's second protected activity—his opposition to the on-campus harassment. The allegations show that Thompson directly opposed the on-campus sexual harassment by his peers every day from October 5, 2020 through October 8, 2020. (*Amend. Compl.* ¶¶ 7a–7b, Doc. 16.) After the verbal altercation with his teacher and his removal from school on October 8, 2020, Thompson was expelled on October 12, 2020. (*Id.* ¶¶ 8–9.) This timing between Thompson's opposition to the bullying at school and his subsequent expulsion is clearly close enough to establish a causal connection between the two at the motion to dismiss stage.

To survive a motion to dismiss, Plaintiffs merely need to allege facts sufficient "to raise a plausible inference of causation." *Schaefer*, 2017 WL 6055153, at *6. Plaintiffs have adequately pled facts supporting the causation requirement for purposes of their prima facie case. Therefore, the Court finds that Plaintiffs have stated a viable claim for retaliation in violation of Title IX. As a result, with respect to Plaintiffs' Title IX retaliation claim, the *Motion* is denied.

### C.  Section 1983 Official Capacity Claims Against Brister and Sherrard

#### 1.  Parties' Arguments

The parties' arguments concerning Plaintiffs' Section 1983 official capacity claims against Brister and Sherrard are virtually identical to those they advanced in connection with Defendants'

first motion; these arguments are detailed in the Court's prior ruling. *See Henderson*, 2022 WL 875592, at *7.

In essence, Brister and Sherrard argue that they, in their official capacities, are not "persons" for purposes of a Section 1983 claim. (Doc. 20-1 at 14–15.) Brister and Sherrard also point out that the Court granted the motion to dismiss the official-capacity claims against them in its prior ruling, and they assert that the allegations in the *Amended Complaint* do not alter that legal analysis. (*Id.* at 15.) In response, Plaintiffs argue that Brister and Sherrard can be held liable in their official capacities for violating Thompson's civil rights, citing several Supreme Court cases, including but not limited to *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658 (1978). (Doc. 25 at 22.) Brister and Sherrard then dispute Plaintiffs' reliance on *Monell* because "Southern is an arm of the State[,]" whereas *Monell* deals with municipal liability. (Doc. 28 at 4.)

### 2.   The Court's Prior Ruling

With respect to the Section 1983 official capacity claims against Brister and Sherrard, the Court focused on the rule that only a "person"—as that term is defined below—may be held liable for Section 1983 claims, explaining:

> "Section 1983 provides a private right of action for damages to individuals who are deprived of 'any rights, privileges, or immunities' protected by the Constitution or federal law by any 'person' acting under the color of state law." *Williams v. Louisiana*, CV No. 17-453-JWD-EWD, 2019 WL 1003645, at *4 (M.D. La. Feb. 28, 2019) (internal quotations omitted) (quoting *Stotter v. Univ. of Tex. at San Antonio*, 508 F.3d 812, 821 (5th Cir. 2007)). "The Supreme Court has held that a State is not a 'person' against whom a § 1983 claim for money damages might be asserted." *Id.* (internal quotations omitted) (quoting *Med. RX/Sys., P.L.L.C. v. Tex. Dep't of State Health Servs.*, 633 F. App'x 607, 610 (5th Cir. 2016)). "This rule extends to 'arms of the state,' and to a state's 'officials acting in their official capacities.'" *Id.* (internal citations and quotations omitted).

*Henderson*, 2022 WL 875592, at *7.

Subsequently, this Court concluded:

Southern University's Board of Supervisors is considered an arm of the State of Louisiana and, therefore, is not a "person" under Section 1983. *See Richardson v. Southern Univ.*, 118 F.3d 450, 456 (5th Cir. 1997). By extension, Brister and Sherrard, as state officials acting in their official capacities, are not "persons" for Section 1983 purposes. Accordingly, the Court will grant Defendants' motion to dismiss Plaintiff's Section 1983 official capacity claims against Brister and Sherrard.

*Id.* at *8.

### 3. Analysis

In sum, the Court agrees with Brister and Sherrard: nothing in the *Amended Complaint* changes the applicability of the Court's prior analysis of the Section 1983 official capacity claims. Thus, the Court reaches the same conclusion here. In addition, because Plaintiffs continue to urge that Brister and Sherrard can be held liable in their official capacities under *Monell*, the Court will briefly address the inapplicability of that case and its progeny. 436 U.S. 658.

In *Will v. Michigan Dep't of State Police*, the Supreme Court ruled that states, state agencies, and state officials sued in their official capacity are not "persons" within the meaning of Section 1983. 491 U.S. 58 (1989). It then explained why this conclusion in no way contradicted its prior decision in *Monell*:

Finally, *Monell* itself is not to the contrary. True, prior to *Monell* the Court had reasoned that if municipalities were not persons then surely States also were not. *Fitzpatrick v. Bitzer*, 427 U.S. [445, 452 (1975)]. And *Monell* overruled *Monroe*, undercutting that logic. But it does not follow that if municipalities are persons then so are States. States are protected by the Eleventh Amendment while municipalities are not, *Monell*, 436 U.S., at 690, n. 54, 98 S.Ct., at 2035, n. 54, and we consequently limited our holding in *Monell* "to local government units which are not considered part of the State for Eleventh Amendment purposes," *ibid.* Conversely, our holding here does not cast any doubt on *Monell*, and applies only to States or governmental entities that are considered "arms of the State" for Eleventh Amendment purposes. See*, e.g., Mt. Healthy Bd. of Ed. v. Doyle*, 429 U.S. 274, 280, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977).

*Id.* at 70.

34

Accordingly, for the foregoing reasons, the Court will grant the *Motion* in this respect and dismiss the Section 1983 official capacity claims asserted against Brister and Sherrard.

### D.  Section 1983 Individual Capacity Claims Against Brister and Sherrard

Brister and Sherrard raise the issue of qualified immunity as to Plaintiffs' Section 1983 claims against them in their individual capacities for violating Thompson's First and Fourteenth Amendment rights. (*See* Doc. 5-1 at 7–11.) The Court will address the claim for violation of the First Amendment and the claim for violation of the Fourteenth Amendment separately. However, because Plaintiffs failed to allege facts sufficient to state a plausible claim for violation of the Fourteenth Amendment, the Court need not discuss qualified immunity for that claim. But the Court notes, without deciding, that Brister and Sherrard would likely be entitled to qualified immunity on the Fourteenth Amendment claim too.

### 1.  Claim for Violation of the First Amendment

### a.  Parties' Arguments

First, Brister and Sherrard point to the prior ruling wherein this Court dismissed the Section 1983 claim for violation of Thompson's First Amendment rights because it found Brister and Sherrard were entitled to qualified immunity. (Doc. 20-1 at 19.) Brister and Sherrard then argue that the claim should be dismissed for the same reasons here, as the *Amended Complaint* "adds no new factual allegations that change [the Court's prior] legal analysis." (*Id.*)

In response, Plaintiffs contend that they have sufficiently pled all three "essential elements of a First Amendment retaliation claim" brought by a student, which the Court discusses in more detail below. (Doc. 25 at 20.) As to the defense of qualified immunity, Plaintiffs argue:

> [I]t was clearly established in 2020, that the First Amendment prohibited a school from taking adverse action against a student for protected speech. The Court need not look any further than Title IX itself, which specifically precludes a school from depriving a student of his education, i.e., removing him from school and expelling

35

him, because he reported and/or opposed sexual harassment. Shortly after Title IX was enacted in 1972, the United States Supreme Court in *Papish v. Board of Curators of the Univ. of Mo.*, 410 U.S. 667, 669-671, 93 S. Ct. 1197, 35 L. Ed. 2d 618 (1973), held that a state university cannot expel a student in retaliation for engaging in activity protected by the First Amendment. *Papish* remains good law. Thus, Brister and Sherrard knew that expelling Mr. Thompson from high school because he reported sexual harassment was against the law.

(*Id.* at 20–21 (footnote omitted); *see also id.* at 21 n.44 (making clear that Thompson's claimed protected activity is his report of sexual harassment, not his verbal altercation with Brown).)

Brister and Sherrard's argument in the reply brief is two-fold. First, they argue that the case relied on by Plaintiffs as providing a First Amendment retaliation claim here—*Papish*, 410 U.S. 667—is factually distinguishable and in no way controls the outcome in this case. (Doc. 28 at 8.) Second, Brister and Sherrard submit that Plaintiffs have still failed to meet their burden of overcoming the qualified immunity defense. (*Id.* (quoting specifically *Bustillos v. El Paso Cnty. Hosp. Dist.*, 891 F.3d 214, 222 (5th Cir. 2018) to explain that a plaintiff's burden here is to find "a case in [their] favor that does not define the law at a high level of generality.").)

### b.  Applicable Law and Analysis

In short, the Court finds that Plaintiffs have failed to show Brister and Sherrard are not entitled to qualified immunity for the alleged retaliation in violation of the First Amendment. Because the First Amendment retaliation claim will be dismissed based on qualified immunity, and because the general law applicable to such claims can be found in the Court's prior ruling, *see Henderson*, 2022 WL 875592, at *10, the Court will not repeat those legal principles here and will instead focus on the qualified immunity question.

This Court previously discussed qualified immunity in detail, gathering authorities and explaining:

"Qualified immunity protects government officials from civil liability in their individual capacity to the extent that their conduct does not violate clearly

established statutory or constitutional rights." *Garcia v. Blevins*, 957 F.3d 596, 600 (5th Cir. 2020), *cert denied*, 141 S. Ct. 1058 (2021) (quoting *Cass v. City of Abilene*, 814 F.3d 721, 728 (5th Cir. 2016)). "It shields 'all but the plainly incompetent or those who knowingly violate the law.' " *Id.* (quoting *Thompson v. Mercer*, 762 F3d 433, 437 (5th Cir. 2014)). To rebut a defendant's qualified immunity defense, the plaintiff must demonstrate "(1) that [the defendant] violated a federal statutory or constitutional right and (2) that the unlawfulness of the conduct was 'clearly established at the time.' " *Cloud v. Stone*, 993 F.3d 379, 383 (5th Cir. 2021) (quoting *Rich v. Palko*, 920 F.3d 288, 294 (5th Cir. 2019)). "[The Court] can analyze the prongs in either order or resolve the case on a single prong." *Id.* (quoting *Garcia*, 957 F.3d at 600).

Regarding the second prong, Plaintiff "bear[s] the burden of showing that the right was clearly established." *Garcia*, 957 F.3d at 600 (citing *Cass*, 814 F.3d at 733). "To be clearly established, a right must be 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.' " *Id.* at 600–01 (quoting *Mullenix v. Luna*, 577 U.S. 7 (2015) (per curiam)). The Court "cannot 'define clearly established law at a high level of generality.' " *Id.* at 601 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). "Rather, the question must be 'frame[d] ... with specificity and granularity.' " *Id.* (quoting *Morrow v. Meachum*, 917 F.3d 870, 874–75 (5th Cir. 2019)). Courts "do not require plaintiffs to identify a case 'directly on point,' but the case law must 'place the statutory or constitutional question *beyond debate*.' " *Id.* at 600–01 (internal brackets omitted) (quoting *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011)). "Our inquiry 'must be taken in light of the specific context of the case, not as a broad general proposition.' " *Id.* at 601 (quoting *Mullenix*, 136 S. Ct. at 308).

*Id.* at *8.

The Court also stated that, "[w]hen considering a defendant's entitlement to qualified immunity, [the Court] must ask whether the law so clearly and unambiguously prohibited his conduct that '*every* reasonable official would understand that what he is doing violates [the law].' " *Id.* at *10 (quoting *McLin v. Ard*, 866 F.3d 682, 695–96 (5th Cir. 2017) (quoting *Morgan*, 659 F.3d at 371)). The Court explained:

"To answer that question in the affirmative, we must be able to point to controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity." *Id.* at 696 (quoting *Morgan*, 659 F.3d at 371–72). "Where no controlling authority specifically prohibits a defendant's conduct, and when the federal circuit courts are split on the issue, the law cannot be said to be clearly established." *Id.* (quoting *Morgan*, 659 F.3d at 372).

*Id.*

>    Finally, with these principles in mind, the Court concluded:

>    Even if the allegations of Plaintiff's Petition sufficiently established that Brister and Sherrard's conduct was in violation of J.T.'s First Amendment rights, the Court still concludes that Defendants are entitled to qualified immunity on Plaintiff's Section 1983 claim under the factual circumstances, as alleged in the Petition. As previously noted, Plaintiff has the burden of establishing a violation of clearly established law. *See Garcia*, 957 F.3d at 600 (citing *Cass*, 814 F.3d at 733). Here, Plaintiff has not pointed to "controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity." *McLin*, 866 F.3d at 696 (citation omitted). Consequently, the Court does not find that the law "so clearly and unambiguously prohibited" Brister and Sherrard's conduct that every reasonable school official would understand that their actions—*i.e.*, the disciplinary actions taken against J.T. following his verbal altercation with a teacher—violated the First Amendment. *See id.* at 695 (quoting *Morgan*, 659 F.3d at 371). Accordingly, the Court concludes that Sherrard and Brister are entitled to qualified immunity and, for that reason, will grant Defendants' motion to dismiss Plaintiff's First Amendment claims under Section 1983.

*Id.*

   The same result is justified here. The *Amended Complaint* in no way alters the applicability of the Court's previous qualified immunity analysis because Plaintiffs still have not met their burden of presenting "controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity." *McLin*, 866 F.3d at 696 (citation omitted).

   To purportedly show that Brister and Sherrard knew it was against the law to expel Thompson from high school "because" he reported sexual harassment, Plaintiffs present a single case, *Papish*, 410 U.S. 667. (Doc. 25 at 20–21.) However, as Brister and Sherrard correctly point out, *Papish* concerns "a university graduate student who distributed newspapers with indecent content. . . . [t]he case establishes nothing about whether the First Amendment prohibits high school administrators from disciplining a student for an altercation, investigating claims of

harassment, discounting his version of events to Human Resources, or requiring him to document his claims." (Doc. 28 at 8.) Therefore, the Court finds that Brister and Sherrard are entitled to qualified immunity and the *Motion*—as far as it seeks dismissal of the Section 1983 claim for retaliation in violation of the First Amendment—is granted.

### 2.   Claim for Violation of the Fourteen Amendment

#### a.   Parties' Arguments

Brister and Sherrard argue that Plaintiffs' Section 1983 equal protection claim against them in their individual capacities should be dismissed because the allegations in the *Amended Complaint* still fail to plausibly show a violation of the Fourteenth Amendment based on a "class-of-one" equal protection claim. According to Brister and Sherrard, Plaintiffs' allegations do not show that Thompson is similarly situated to the students who harassed him in the group text, nor do they show that there was no rational basis for treating Thompson's altercation with his teacher differently from the harassing messages non-homosexual students sent in the group text. (Doc. 20-1 at 16–17.) In particular, Brister and Sherrard attack Plaintiffs' allegations that Thompson and the harasser-students were similarly situated simply because they all committed "major" infractions as defined in the school's code of conduct. (Doc. 20-1 at 17.) Brister and Sherrard continue:

> The discipline policy invoked by the amended complaint identifies more than 30 misbehaviors that could be labeled "major" infractions. Major infractions range from violent offenses like rape, kidnapping, use of a dangerous weapon, and assault/battery of students or teachers to lesser, non-violent offenses like skipping class, disobedience, and use of profane language. There would indeed be a rational basis to levy more severe punishment on a student who engaged in rape or kidnapping as compared with a student who skipped class or used profanity. Not all violations of Southern's code of conduct dictate the same treatment. Merely alleging that Thompson and his alleged harassers all committed "major" offenses fails to establish that the students were similarly situated and deserved identical consequences. The Fourteenth Amendment does not require a school to discipline a student who commits the "major" infraction of rape with the same consequences as a student who commits the "major" infraction of skipping class.

(*Id.* at 17–18 (citing Ex. B, Southern University Lab School Student Handbook, Doc. 20-3 at 38–41) (footnotes omitted).)

Further, Brister and Sherrard point out that "the discipline code identifies ranges of consequences for each ['major'] offense[,]" and thus the school "had a rational basis for administering different punishments even among major infractions." (*Id.* at 18–19.) Finally, they aver that even if Plaintiffs have adequately stated a viable Fourteenth Amendment violation, this claim should still be dismissed because "Brister and Sherrard are shielded by qualified immunity." (*Id.* at 19.)

In opposition to the *Motion*, Plaintiffs first confront Brister and Sherrard's argument that not all "major" violations dictate the same treatment and that "there existed a rational basis to treat" Thompson differently; according to Plaintiffs, both of these contentions require credibility determinations and thus cannot be decided on a Rule 12(b)(6) motion. (Doc. 25 at 21.) Nevertheless, with respect to the first prong, Plaintiffs argue they have plausibly shown that Brister and Sherrard intentionally treated Thompson differently from others similarly situated because they alleged that: (1) Thompson was expelled, banned from campus, and deprived of his education due to the verbal altercation with his teacher, which constitutes a "major" infraction under the Student Code of Conduct; and (2) Thompson's non-homosexual classmates who allegedly harassed him in the group text also committed a "major" infraction when they sent those messages, but they were treated differently because they did not suffer the same punishment as Thompson. (*Amend. Compl.* ¶ 9, Doc. 16; Doc. 25 at 21.) As to the second prong, Plaintiffs simply allege that "[n]o rational basis existed to expel and ban" Thompson from school. (*Amend. Compl.* ¶ 9, Doc. 16.) Finally, Plaintiffs provide no meaningful argument or legal authority concerning qualified

immunity, but simply claim that "Brister and Sherrard's conclusory, single sentence argument that they are entitled to qualified immunity is unavailing." (Doc. 25 at 21.)

In reply, Brister and Sherrard dispute Plaintiffs' contention that a credibility determination is required, claiming: (1) Plaintiffs provide no support for such an argument; and (2) "no one's credibility is at issue." (Doc. 28 at 9.) Brister and Sherrard's other arguments here mirror those made in the original memorandum supporting their *Motion*.

### b.  The Court's Prior Ruling

As the Court explained in its prior ruling:

> "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting U.S. Const. amend. XIV, § 1). The Supreme Court has recognized equal protection claims based on a "class of one." *See Vill. of Willowbrook v. Olech*, 528 U.S. 562 (2000). To state a "class of one" equal protection claim, "the plaintiff must establish (1) he was 'intentionally treated differently from others similarly situated' and (2) there was no rational basis for any such difference." *Wilson v. Birnberg*, 667 F.3d 591, 599 (5th Cir. 2012) (citing *Whiting v. Univ. of S. Miss.*, 51 F.3d 339, 348 (5th Cir. 2006)).

*Henderson*, 2022 WL 875592, at *9.

At the time the Court ruled on the first motion to dismiss, Henderson argued that "Brister and Sherrard 'treated [Thompson]'s sexual harassment complaint differently than other complaints of improper conduct'; namely, [Thompson]'s verbal altercation with Mr. Brown." *Id.* (quoting Doc. 7 at 11). Ultimately, this Court concluded that Henderson had not alleged facts sufficient to support a Section 1983 claim for an equal protection violation. *Id.* The reasoning was as follows:

> Contrary to Plaintiff's assertion, however, the Petition does not "clearly allege[ ] that defendants Sherrard and Brister took no action against the [Southern] Lab students for sexually harassing J.T." (*Compare* Doc. 7 at 11, *with* Doc. 1-2 at 1–5.) In fact, the Petition contains no allegations that the individual Defendants treated other, similarly situated students differently. Nor does the Petition allege that there

was no rational basis for the disciplinary action taken against J.T. for the verbal altercation with his teacher. Moreover, as the Fifth Circuit recently noted, "the fact that school officials may not have adequately responded to a student's complaints does not itself rise to the level of an equal protection violation." *Ruvalcaba v. Angleton Indep. Sch. Dist.*, No. 20-40491, 2022 WL 340592, at *3 (5th Cir. Feb. 4, 2022) (internal quotation marks and brackets omitted) (quoting *Priester v. Lowndes Cty.*, 354 F.3d 414, 424 (5th Cir. 2004)).

*Id.*

Given that conclusion, it was not necessary to discuss whether Brister and Sherrard were entitled to qualified immunity on this claim. Henderson failed to state a viable claim for violation of Thompson's rights under the Equal Protection Clause of the Fourteenth Amendment. *Id.* For that reason, the Section 1983 equal protection claims against Brister and Sherrard were dismissed. *Id.*

### c.  Applicable Law and Analysis

The *Amended Complaint* appears to frame Plaintiffs' equal protection argument in a different way. As Defendants put it: "The amended complaint reimagines the plaintiffs' claim for violating Fourteenth Amendment rights, now opting to compare the defendants' treatment of Thompson to the way the alleged harassers were punished." (Doc. 20-1 at 16.) In sum, although the *Amended Complaint* certainly adds needed substance to Plaintiffs' allegations concerning this claim, it still fails to plausibly state an equal protection violation.

"The Equal Protection Clause of the Fourteenth Amendment is 'essentially a direction that all persons similarly situated should be treated alike.' " *Wood v. Collier*, 836 F.3d 534, 538 (5th Cir. 2016) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). "Its basics are rote: '[e]qual protection does not require that all persons be dealt with identically, but it does require that a distinction made have some relevance to the purpose for which the classification is made.' " *Id.* at 538–39 (quoting *Baxstrom v. Herald*, 383 U.S. 107, 111 (1966)). "In cases that do

not implicate suspect classes or fundamental rights, the appropriate standard of review is whether the difference in treatment between classes rationally furthers a legitimate state interest." *Id.* at 539 (cleaned up). Importantly, "[u]nder rational basis review, differential treatment must be upheld against equal protection challenge if there is *any* reasonably conceivable state of facts that could provide a rational basis for the classification." *Id.* (citation omitted) (emphasis added).

"An equal protection claim that is premised on differential treatment but not based on membership in a suspect class or the infringement of a fundamental right may be cognizable as a so-called 'class of one.' " *Id.* (quoting *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)). Plaintiffs do not allege membership in a class or infringement of a fundamental right and thus proceed under the class-of-one theory. Courts examine "class of one" equal protection claims "under a two-prong test: the plaintiff must show that (1) he or she was intentionally treated differently from others similarly situated and (2) there was no rational basis for the difference in treatment." *Id.* (quoting *Lindquist v. City of Pasadena*, 669 F.3d 225, 233 (5th Cir. 2012) (citing *Olech*, 528 U.S. at 564)).

Here, as explained above, Plaintiffs allege that "[n]o rational basis existed to expel and ban" Thompson from school. (*Amend. Compl.* ¶ 9, Doc. 16.) Plaintiffs provide little substantive argument as to rational basis in their opposition, but instead contend that the question of whether a rational basis existed to treat Thompson differently "is a credibility determination which cannot be decided on a" Rule 12(b)(6) motion. (Doc. 25 at 21.)

Plaintiffs are mistaken in their contention that the Court cannot decide whether a rational basis existed when deciding a Rule 12(b)(6) motion. Numerous courts have dismissed a "class of one" equal protection claim on a Rule 12(b)(6) motion to dismiss based on their finding that "the government's actions [were] rationally related to a legitimate government interest." *Holden v.*

43

*Perkins*, 398 F. Supp. 3d 16, 25 (E.D. La. 2019) (citing *La. Cmty. Dev. Cap. Inv. Fund, Inc. v. Grambling Legends Square Taxing Dist.*, No. 14-2212, 2015 WL 1737954, at \*9 (W.D. La. Mar. 16, 2015), *report and recommendation adopted*, No. 14-2212, 2015 WL 1800319 (W.D. La. Apr. 16, 2015) (dismissing plaintiffs' "class of one" equal protection claim on a Rule 12(b)(6) motion where stated explanation for differential treatment was rational); *XP Vehicles, Inc. v. Dep't of Energy*, 118 F. Supp. 3d 38, 78 (D.C. Cir. 2015) (finding plaintiffs' complaint did not contain sufficient allegations to survive defendant's 12(b)(6) motion to dismiss where there were no other similarly situated individuals and there was a rational basis for the differential treatment)). The Court is compelled to do the same here. Even construing the allegations in the *Amended Complaint* in a light most favorable to Plaintiffs, they have failed to plausibly show that Southern lacked any rational basis for the difference in treatment here.

Plaintiffs' barebones allegation that "[n]o rational basis existed to expel and ban" Thompson from school is lacking in any factual support. (*Amend. Compl.* ¶ 9, Doc. 16.) Not only that, but their allegation that Southern had no rational basis for expelling Thompson is belied by other allegations in the *Amended Complaint*, namely their acknowledgement that Thompson had a verbal altercation with his teacher, was escorted out of class directly after the altercation, and that Brister informed Thompson he was being expelled because of the verbal altercation. (*Id.* ¶¶ 8–9.) Again, "[u]nder rational basis review, differential treatment must be upheld against equal protection challenge if there is *any* reasonably conceivable state of facts that could provide a rational basis for the classification." *Collier*, 836 F.3d at 539 (citation omitted) (emphasis added); *see Lindquist v. City of Pasadena, Tex.*, 525 F.3d 383, 387 (5th Cir. 2008) (explaining that, "to ultimately prevail on the claim, the [plaintiffs] must carry the heavy burden of 'negativ[ing] any reasonably conceivable state of facts that could provide a rational basis' for their differential

treatment.") (citation omitted). These facts do more than suggest a rational reason for why Southern treated Thompson differently from the students who harassed him by expelling Thompson.

Based on the foregoing, the Court need not determine whether Plaintiffs' allegations show that the other students and Thompson were similarly situated or whether Brister and Sherrard are entitled to qualified immunity on this claim. Plaintiffs failed to state a plausible "class of one" equal protection claim. Accordingly, the *Motion* is granted in this respect, and the Section 1983 claim for violation of Thompson's rights under the Fourteenth Amendment is dismissed.

### E.  State Law Claim for Invasion of Privacy Against Sherrard

The final issue raised in the *Motion* is whether Plaintiffs adequately pled a claim for invasion of privacy under Louisiana law. Plaintiffs allege that Sherrard violated Thompson's right to privacy and confidentiality under Louisiana law when she disclosed his identity to the students who cyberbullied him. (*See Amend. Compl.* ¶ 14, Doc. 16.) When ruling on the first motion to dismiss, the Court declined to exercise supplemental jurisdiction over this pendent state law claim due to having already dismissed all the federal claims without prejudice. *Henderson*, 2022 WL 875592, at *9. Here, however, as explained above, the Court has determined that the *Amended Complaint* states a viable claim for retaliation in violation of Title IX. As such, the Court will now examine the sufficiency of Plaintiffs' state law claim against Sherrard.

### 1.  Parties' Arguments

Sherrard maintains that the Court should decline to exercise supplemental jurisdiction over this state law claim as it did in its prior ruling. (Doc. 20-1 at 21.) Alternatively, Sherrard argues that the claim for violation of Thompson's right to privacy under Louisiana law should be dismissed on the merits because it is "implausible; the alleged harassers had to have known

Thompson's identity to harass him in the first place and would have immediately understood the complaining party to be the object of their texts, especially considering his sudden departure from the text messaging group." (*Id.*) Further, even if Sherrard disclosed new information beyond Thompson's identity, she claims that: (1) it is unclear whether Louisiana has waived sovereign immunity for such a claim; and (2) nonetheless, if sovereign immunity has not been waived, "Louisiana law does not provide a cause of action for this conduct." (*Id.*)

First, to the extent Plaintiffs are asserting a claim against Sherrard in her individual capacity under Article I, Section 5 of the Louisiana Constitution, Sherrard argues that such a constitutional claim must be dismissed as it is inapplicable in cases like this one, where the "defendant is a private party." (*Id.* at 21–22 (quoting *Hennig v. Alltel Commc'ns, Inc.*, 05-96 (La. App. 5 Cir. 5/31/05), 903 So. 2d 1137, 1140 (citation omitted)).) As for the claim against her in her official capacity, according to Sherrard, Louisiana law only recognizes four actionable privacy invasions, none of which are applicable here. (*Id.* at 22 (citing *Hennig*, 903 So. 2d at 1140–41 (quoting *Jaubert v. Crowley Post-Signal, Inc.*, 375 So. 2d 1386, 1388–89 (La. 1979)))).) Specifically, "[a]n accuser has no privacy interest in his identity [under Louisiana law], particularly where his identity must be revealed in order to investigate the allegation." (*Id.*)

Opposing Sherrard's arguments, Plaintiffs first aver that the information disclosed by Sherrard was in fact private, as established by various authorities, specifically: (1) Thompson enjoys a right to privacy under the Louisiana Constitution, Article I, Section 5; (2) Thompson's identity as a complainant of sexual harassment in violation of Title IX is private under Title IX's federal regulation, 34 C.F.R. § 106.71; and (3) under the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232(g), Sherrard was precluded from sharing confidential, personal

information contained in Thompson's "educational file, i.e., that he filed a sexual harassment complaint under Title IX against other students." (Doc. 25 at 23.)

Thereafter, Plaintiffs make clear that Thompson's invasion of privacy claim against Sherrard is based in Louisiana tort law. (*Id.*) More specifically, they argue that the circumstances here constitute an "unreasonable public disclosure of embarrassing private facts[,]" (*id.* (citing *Jaubert*, 375 So. 2d at 1388) (emphasis omitted)), as Sherrard disclosed private, sensitive, embarrassing facts about Thompson to his classmate without Thompson's consent, (*id.* at 24). According to Plaintiffs, whether Sherrard violated the standard above requires the Court to conduct a factual-inquiry not appropriate at this stage in the proceedings, whereby the Court balances various interests of both parties. (*Id.* at 23–24 (citing *Walker-Jones v. La. Ass'n of Educators*, No. 15-584, 2016 WL 1169473 (M.D. La. Mar. 22, 2016) (Dick, C.J.)).) For these reasons, Plaintiffs maintain that Thompson's state law claim should not be dismissed.

In reply, Sherrard first appears to argue that Plaintiff has waived certain issues, which will be discussed further below. (Doc. 28 at 9.) Next, Sherrard attacks Plaintiffs' contention that she invaded Thompson's privacy under Louisiana law by disclosing embarrassing, private facts. (*Id.*) Specifically, according to Sherrard, there is no actionable claim for invasion of privacy under Louisiana law for her conduct here, because "[t]o be actionable, a defendant's conduct must be unreasonable and seriously interfere with the plaintiff's privacy interest." (*Id.* (quoting *Walker-Jones*, 2016 WL 1169473, at *2).) Here, federal law—namely, Title IX—gave Southern the right to investigate Thompson's complaints as it saw fit. (*Id.* (citing *Sanches*, 647 F.3d at 170).) In addition, Sherrard claims that the disclosure here was neither "public" nor of an "embarrassing private fact[,]" because she only disclosed this information to a single student under investigation,

and the *Amended Complaint* alleges that Sherrard disclosed Thompson's identity only, which is not an embarrassing or private fact. (*Id.* at 10.)

## 2.  Applicable Law and Analysis

The Court will first address Sherrard's contention that Plaintiffs waived arguments on certain issues. Although Sherrard maintains that Plaintiffs failed to address her argument that she cannot be sued in her individual capacity for a constitutional claim, suggesting a waiver of this argument, Plaintiffs counter that the invasion of privacy claim is based on Louisiana tort law, not the Louisiana Constitution. (*See* Doc. 25 at 23.) Additionally, Sherrard seems to argue waiver of any claim against her in her official capacity because Plaintiffs failed to address whether Louisiana has waived sovereign immunity. (*See* Doc. 28 at 9.) However, Sherrard did not provide any legal authority showing Louisiana has not waived sovereign immunity for such a claim, nor did she definitively argue that sovereign immunity applies here. (Doc. 20-1 at 21 n.97 ("It is not clear whether Louisiana has waived sovereign immunity for such a claim").) Thus, the Court finds Sherrard's arguments here unavailing.

Louisiana tort law recognizes an action for invasion of one's right to privacy in certain circumstances. As another section of this Court has explained:

> Louisiana courts have allowed tort actions for invasion of privacy which involves the basic right of a person to be let alone in his private affairs. An unwarranted invasion of a person's right of privacy may give rise to liability for the resulting harm. The determination of whether a person's conduct constitutes the tort of invasion of privacy depends upon the facts and circumstances of each case. The right of privacy embraces four different interests, each of which may be invaded in a distinct fashion: (1) the appropriation of an individual's name or likeness for the use or benefit of the defendant; (2) an unreasonable intrusion by the defendant upon the plaintiff's physical solitude or seclusion; (3) publicity that unreasonably places the plaintiff in a false light before the public; and (4) unreasonable public disclosure of embarrassing private facts.

*Walker-Jones*, 2016 WL 1169473, at *2 (citations and footnotes omitted).

As the Court acknowledged, however, recognition of such a claim in Louisiana has its limits:

> Louisiana courts have also distinguished actionable from non-actionable invasions. To be actionable, a defendant's conduct must be unreasonable and must seriously interfere with the plaintiff's privacy interest. It is not necessary to prove that the defendant acted with malicious intent. The reasonableness of the defendant's acts is determined by balancing the interests of the plaintiff in protecting his privacy from serious invasions with the defendant's interest in pursuing his course of conduct. Where the defendant's action is properly authorized or *justified by circumstances*, it is deemed reasonable and non-actionable, even though it admits to a slight invasion of the plaintiff's privacy.

*Id.* (footnotes and citations omitted) (emphasis added).

Here, Plaintiffs proceed under the fourth recognized privacy interest, arguing that Sherrard's disclosure of Thompson's identity to one of his alleged harassers constituted an unreasonable disclosure of embarrassing private facts. Plaintiffs specifically allege that, on September 7, 2020, Sherrard informed Thompson that "she had spoken with a student out of the approximately twenty (20) students involved in the sexual harassment and had made the parents of that student aware of their child's involvement in the incident." (*Amend. Compl.* ¶ 4, Doc. 16; *see id.* ¶ 6 (alleging that Southern "publicly disclos[ed] Mr. Thompson's identity as the 'complainant' to" one of the students who harassed him).) According to Plaintiffs, as a result of this disclosure, the student "face-time called" Thompson on September 10, 2020 and "threatened him because he reported the sexual harassment." (*Id.* ¶ 7.) Plaintiffs' allegations do not provide that any information was disclosed to this student other than Thompson's identity. (*See id.* ¶ 14; *see also* Doc. 25 at 23.)

Again, to have an actionable claim for invasion of Thompson's privacy, Plaintiffs' allegations must plausibly show that Sherrard's conduct: (1) was unreasonable, and (2) seriously interfered with Thompson's privacy interest. *Walker-Jones*, 2016 WL 1169473, at *2. In

determining the reasonableness of Sherrard's conduct, the Court is to balance Thompson's interests in protecting his privacy from serious invasions against Sherrard's interest—on behalf of Southern—in handling Thompson's complaints of sexual harassment. *Id.* In terms of the reasonableness of Sherrard's conduct, the Title IX regulations confirm Thompson had a privacy interest in the confidentiality of his identity as a person who reported sexual harassment: "The recipient must keep confidential the *identity* of any individual who has made a report or complaint of sex discrimination, including any individual who has made a report or filed a formal complaint of sexual harassment . . . ." 34 C.F.R. § 106.71(a) (emphasis added). Thus, taking the allegations of the *Amended Complaint* as true, Sherrard likely invaded Thompson's privacy interest by disclosing his identity as the complainant of the sexual harassment to one of the students who allegedly harassed him as well as that student's parents.

Moreover, when balancing Thompson's privacy interest against Sherrard's purpose for disclosing Thompson's identity as the complainant, the Court cannot say that Sherrard's conduct was reasonable under the circumstances. The allegations reveal that days after Sherrard spoke with the student, Thompson's mother (Henderson) was informed by Brister that the school had not yet investigated the incident. (*Amend. Compl.* ¶ 5, Doc. 16.) Thus, construing the allegations in a light most favorable to Plaintiffs, Sherrard did not disclose Thompson's identity as the complainant while pursuing an investigation into the incident or in an attempt to glean more information about the alleged harassment. If Sherrard's objective was simply to reprimand the student, it is unclear how disclosing that *Thompson* was the source of the report served that purpose.

Finally, Plaintiffs' allegations likewise show that the intrusion at issue "seriously interfered" with Thompson's privacy interest in his identity as a sexual harassment complainant. Again, after Sherrard made this disclosure to the unnamed student, that student allegedly "face-

time called" Thompson on September 10, 2020 and "threatened him because he reported the sexual harassment." (*Id.* ¶ 7.) The Court finds these facts sufficient at the motion to dismiss stage to show Sherrard's disclosure was unreasonable and seriously interfered with Thompson's privacy interest under the circumstances. Whether Plaintiffs will ultimately prove successful on their invasion of privacy claim is a question for another day; Plaintiffs pled a "legally cognizable claim" for invasion of privacy under Louisiana tort law. *Thompson v. City of Waco, Tex.*, 764 F.3d 500, 503 (5th Cir. 2014) (citation omitted). As a result, the Court will deny the *Motion* to dismiss the state law claim against Sherrard.

## IV.    Henderson's Loss of Consortium Claim

As explained above, Plaintiffs allege that Thompson's mother, Henderson, "sustained damages" as a result of the alleged actions taken against her son, which are the subject of this lawsuit. (*Amend. Compl.* ¶ 16, Doc. 16.) Henderson's alleged damages include damages "for loss of consortium, services, and society with her son[.]" (*Id.*) Defendants argue that this claim should be dismissed for the same reasons that Thompson's claims should be dismissed, as it is derivative of and dependent on those claims. (Doc. 20-1 at 23.) As explained above, Thompson's Title IX claim for retaliation and state law claim for invasion of privacy still stand. Thus, because Thompson still has viable claims, Henderson's claim will not be dismissed.

## V.    Leave to Amend

Plaintiffs do not seek in the alternative another opportunity to amend. Should they do so, the Court will deny such request.

Federal Rule of Civil Procedure 15(a) "requires a trial court to grant leave to amend freely, and the language of this rule evinces a bias in favor of granting leave to amend." *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 994 (5th Cir. 2005) (cleaned up). However, "[l]eave to amend is

in no way automatic . . . the district court must possess a 'substantial reason' to deny a party's request for leave to amend." *Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 378 (5th Cir. 2014) (quoting *Jones*, 427 F.3d at 994 (citation and internal quotation marks omitted)). The Fifth Circuit further described a district court's discretion on a motion to amend as follows:

> The district court is entrusted with the discretion to grant or deny a motion to amend and may consider a variety of factors including "undue delay, bad faith or dilatory motive on the part of the movant, repeated failures to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party . . . , and futility of the amendment." [*Jones*, 427 F.3d at 994] (citation omitted). "In light of the presumption in favor of allowing pleading amendments, courts of appeals routinely hold that a district court's failure to provide an adequate explanation to support its denial of leave to amend justifies reversal." *Mayeaux v. La. Health Serv. and Indent. Co.*, 376 F.3d 420, 426 (5th Cir. 2004) (citation omitted). However, when the justification for the denial is "readily apparent," a failure to explain "is unfortunate but not fatal to affirmance if the record reflects ample and obvious grounds for denying leave to amend." *Id.* (citation and internal quotation marks omitted).

*Id.*

In addition, the Fifth Circuit has made clear that "[d]enying a motion to amend is not an abuse of discretion if allowing an amendment would be futile." *Id.* (citing *Briggs v. Mississippi*, 331 F.3d 499, 508 (5th Cir. 2003)). An amendment would be deemed futile "if it would fail to survive a Rule 12(b)(6) motion." *Id.* (citing *Briggs*, 331 F.3d at 508).

Having carefully considered the matter, the Court will deny leave to amend. First, as stated above, "repeated failures to cure deficiencies by amendments previously allowed" is a factor to consider when granting or denying leave to amend, as is undue delay. *Id.* (citation omitted). Here, Plaintiffs had the benefit of the Court's ruling on Defendants' original motion to dismiss, yet Plaintiffs failed to cure the deficiencies of the last complaint. Second, even putting this aside, further amendment would be futile; through their failure to properly amend, Plaintiffs have shown

that they have no further allegations to make concerning their Title IX claim for deliberate indifference to sexual harassment and their Section 1983 claim for violation of Thompson's constitutional rights. Consequently, Plaintiffs will be denied leave to amend, and those claims will be dismissed with prejudice. *See Apollo Energy, LLC v. Certain Underwriters at Lloyd's, London*, 387 F. Supp. 3d 663, 679 (M.D. La. 2019) (deGravelles, J.) (denying leave to amend when plaintiff should have had notice of issue from court's ruling on original motion to dismiss, and when further amendment would be futile); *Skinner v. Ard*, 519 F. Supp. 3d 301, 321–22 (M.D. La. 2021) (deGravelles, J.) (same); *Martin v. Roy*, No. 20-339, 2022 WL 894599, at \*13 (M.D. La. Mar. 25, 2022) (deGravelles, J.) (same).

## VI.    Conclusion

Accordingly,

**IT IS ORDERED** that the *Motion to Dismiss Under Rule 12(B)(6)* (Doc. 20) filed by Defendants Southern, Brister, and Sherrard, is **GRANTED** in part and **DENIED** in part.

**IT IS FURTHER ORDERED THAT** the *Motion* is **GRANTED** in that the claims for (a) discrimination based on deliberate indifference to sexual harassment in violation of Title IX against Southern, and (b) violation of Plaintiff Thompson's rights under the First and Fourteenth Amendments of the U.S. Constitution pursuant to 42 U.S.C. § 1983 against Brister and Sherrard are **DISMISSED WITH PREJUDICE**. In all other respects, the *Motion* is **DENIED**.

Signed in Baton Rouge, Louisiana, on <u>March 23, 2023</u>.

_____

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**