UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

JILL HENDERSON, ET AL.

VERSUS

BOARD OF SUPERVISORS OF
SOUTHERN UNIVERSITY AND
A&M COLLEGE, ET AL.

CIVIL ACTION

NO. 21-297-JWD-RLB

## RULING AND ORDER

This matter comes before the Court on *Defendants' Motion for Summary Judgment* ("*Motion for Summary Judgment*" or "*Motion*"), (Doc. 62), filed by Defendants the Board of Supervisors of Southern University and A&M College ("Southern") and Renita Sherrard, individually and in her official capacity as assistant principal of the Southern Laboratory School ("Sherrard") (collectively, "Defendants"). Plaintiffs Justin Thompson ("Thompson") and Jill Henderson, Thompson's mother, ("Henderson") (collectively, "Plaintiffs") oppose the motion. (Doc. 71.) Defendants filed a reply. (Doc. 72.) Oral argument is not necessary. The Court has carefully considered the law, the facts, and the arguments and submissions of the parties and is prepared to rule. For the following reasons, the *Motion* is granted in part and denied in part.

I.    BACKGROUND

    A. Factual Background

This action arises from the sexual harassment of Thompson while he was a high school student at the Southern University Laboratory School ("Southern Lab"). In August of 2020, Thompson was enrolled at Southern Lab and classified as a member of the senior class. (Deposition of Brister, Doc. 71-4 at 4, 7.) He was a part of a text message group comprised of other members of Southern Lab's senior class. (*See* Defendants' Statement of Undisputed Material Facts

1

("DSUMP"), Doc. 62-2 at 1, ⁋ 2; Plaintiffs' Opposition and Statement of Disputed Material Facts

("POSDMF"), Doc. 71-1 at 2, ⁋ 2.) Defendants contend, and put on evidence of such, that the text

message group was not a school-sponsored activity, (*see* Deposition of Franklin, Doc. 62-7 at 5–

6), but Plaintiffs contend, and put on such evidence, that Thompson was told by his school

counselor Crystal Franklin ("Franklin") to join the text message group, (Deposition of Thompson,

Doc. 71-2 at 28). Franklin did direct Thompson to seek information about how to communicate

with his class, but there is conflicting evidence as to whether Franklin directed Thompson to seek

this information from Rashana Smart, the adult senior sponsor, or from another classmate. (*See*

Deposition of Franklin, Doc. 62-7 at 5; Deposition of Thompson, Doc. 71-2 at 28.)

In this group text message, certain Southern Lab students made comments about

Thompson's sexual orientation, including:

1. demanding to know whether Thompson was homosexual and stating that it was "hard to believe" and a lie that he was not (Group Text Message, Doc. 62-4 at 16);
2. asking other students in the thread what his or her "take" was and how he or she "felt" about whether Thompson was homosexual (*Id.* at 15–16);
3. calling Thompson "gay," "gay n***a," and "sissy" (*Id.* at 13–14);
4. discussing hypothetical information about Thompson's sexual life, including with a female student, and comparing Thompson to a homosexual meme of "SpongeBob Square Pants" (*Id.* at 15–19);
5. posting derogatory pictures in reference to Thompson, including emojis of painted nails and smiley faces referencing Thompson as female and/or with other female traits (*Id.* at 12–17);
6. falsely accusing Thompson of performing homosexual acts on other student(s), that Thompson was allegedly going to "dog[]" another student "out" (*Id.* at 18);
7. characterizing the harassment of Thompson as "bonding" between the Senior class (*Id.* at 17);
8. texting "dead" face emojis and encouragement of derogatory comments about Thompson's sexual orientation (*Id.* at 13–18); and
9. threatening that a student will "flip tf [the f***k] out" because Thompson is allegedly a homosexual (*Id.* at 18).

Within two hours of being added, Thompson left the group text message. (*See* DSUMP, Doc. 62-2 at 1, ▐ 4; POSDMF, Doc. 71-1 at 2–3, ▐ 4.) Before leaving the group text message, Thompson stated: "I'll leave, I don't do subliminal messages, I call out the enemy when I see them." (Group Text Message, Doc. 62-4 at 31.)

Thompson brought the text thread to the school's attention on September 3, 2020. (DSUMP, Doc. 62-2 at 1, ▐ 5; POSDMF, Doc. 71-1 at 3, ▐ 5.) Plaintiffs did not receive an immediate response from Southern Lab's administration, and the Director of the school, Herman Brister, admitted to Henderson that he "dropped the ball" for not contacting her sooner. (Deposition of Brister, Doc. 71-4 at 28–29; *see also* Deposition of Thompson, Doc. 71-2 at 32 (discussing how Thompson did not receive a prompt response to his complaint from Sherrard, Southern Lab's assistant principal).) Brister believed the comments made in the text thread were "unprovoked," (Defendants' Exhibit 19 at 1:30–2:45, Phone Conversation Between Henderson and Brister, Manually Attached at Doc. 62-21), though Plaintiffs are of the position that on September 8, 2020, Brister insinuated to Henderson that Thompson instigated the harassment, (*see* POSDMF, Doc. 71-1 at 3, ▐ 6; Deposition of Thompson, Doc. 71-2 at 118–19).

Once the Southern Lab administration was able to decipher what the students meant by their messages in the group text message, Thompson's complaint was handed over to the school's Dean of Students, Darryl Asberry. (Deposition of Asberry, Doc. 62-8 at 2–3; Deposition of Sherrard, Doc. 62-5 at 8–9.) Students who made inappropriate comments towards Thompson in the group text message were suspended. (Deposition of Brister, Doc. 62-3 at 12.) Defendants are of the position that this was the maximum penalty they could have awarded pursuant to their student handbook, but Plaintiffs are of the position that a harsher penalty could have been awarded. (*See* Deposition of Asberry, Doc. 62-8 at 6–7; Deposition of Thompson, Doc. 71-2 at 54–55.)

During this time, Sherrard informed Thompson that she had spoken with student D.M.'s mother about D.M.'s involvement in the group text message. (*See* Deposition of Thompson, Doc. 71-2 at 30–36.) D.M.'s mother requested Thompson's mother's contact information. (*Id.*) Sherrard asked Thompson if she could share his mother's contact information with D.M.'s mother, and Thompson said no. (*Id.*) Thompson received text messages and Facetime calls from D.M. regarding the fact D.M. was suspended because of her activity in the group text message. (*Id.*) The parties put on conflicting evidence as to whether Sherrard disclosed to D.M. Thompson's identity as the complainant. (*Compare id.* at 119–20; Deposition of Henderson, Doc. 71-3 at 2–3 *with* Deposition of Sherrard, Doc. 62-5 at 11.)

From September 14, 2020, to October 4, 2020, Southern Lab conducted school virtually due to the COVID-19 pandemic. (Plaintiffs' Statement of Material Facts ("PSMF"), Doc. 71-1 at 10, ¶¶ 3–4; Defendants' Reply Statement of Material Facts, ("DRSMF"), Doc. 72-1 at 2, ¶¶ 3–4.) In-person learning resumed on October 5, 2020. (PSMF, Doc. 71-1 at 10, ¶ 4; DRSMF, Doc. 72-1 at 2, ¶ 4.) Thompson has testified that upon Southern Lab's resumption of in-person learning, he continued to be sexually harassed by other students while at school, and Southern Lab had knowledge of such. (Deposition of Thompson, Doc. 71-2 at 116–18.) Thompson reported these acts of harassment to Sherrard and Franklin. (*Id.* at 17, 21.)

On October 8, 2020, there was a verbal altercation between Thompson and his teacher Tony Brown. (DSUMP, Doc. 62-2 at 2, ¶ 11; POSDMF, Doc. 71-1 at 5, ¶ 11.) Students who witnessed the altercation submitted written statements that Thompson threatened to physically harm Brown with a pair of scissors. (*See* Doc. 62-11.) Asberry escorted Thompson out of Brown's classroom. (*See* Defendants' Exhibit 10, Video Recording, Manually Attached at Doc. 62-12.) "On October 12, 2020, [Southern Lab], through Principal Brister[,] accused [Thompson] of committing

4

a 'major' infraction and violating the Student Code of Conduct." (PSMF, Doc. 71-1 at 12, ⁋ 16; DRSMF, Doc. 72-1 at 4, ⁋16.) Such an offense is subject to expulsion as per the school's student handbook. (PSMF, Doc. 71-1 at 12, ⁋ 21; DRSMF, Doc. 72-1 at 5, ⁋ 21.)

Thereafter, Southern Lab conducted a disciplinary hearing regarding Thompson's alleged conduct. (*See* Defendants' Exhibit 14, Audio Recording of Disciplinary Hearing, Manually Attached at Doc. 62-16.) The disciplinary panel determined that Thompson had physically threatened Brown and recommended as a punishment that Brown be required to complete the school year virtually. (*See* Defendants' Exhibit 10, Video Recording, Manually Attached at Doc. 62-12.) After completing the school year virtually, Thompson received his high school diploma from Southern Lab in May of 2021, and in the fall of 2021, Thompson began his college education at Tulane University, where he had received a scholarship. (DSUMP, Doc. 62-2 at 3, ⁋⁋ 17–18; POSDMF, Doc. 71-1 at 9, ⁋⁋ 17–18.)

### B. Procedural History

Henderson[1] filed the instant suit in state court against Southern Lab; Brister, individually and in his official capacity as director of Southern Lab[2]; and Sherrard, individually and in her official capacity as assistant principal of Southern Lab. (*See* Doc. 1-2 at 1.) The case was removed to this Court on May 19, 2021. (Doc. 1.) Plaintiffs asserted the following claims: (1) deliberate indifference to student-on-student sexual harassment and retaliation in violation of Title IX of the Educational Amendments of 1982, 20 U.S.C. § 1681, *et seq*., against Southern;[3] (2) violation of

---

[1] At the time suit was originally filed, Thompson was still a minor. Thus, the sole plaintiff in this case was Thompson's mother, Henderson, who brought claims individually and on behalf of her then minor son. Because Thompson has since reached the age of majority, he is now a proper plaintiff in this suit.
[2] Brister was terminated form this suit on March 23, 2023, following this Court ruling on Defendants' *Motion for to Dismiss Under Rule 12(b)(6)*. (Doc. 39.)
[3] It was originally unclear in this case whether Plaintiffs asserted claims against Sherrard individually for violating Title IX. (*See Amend. Compl.* ¶ 15, Doc. 16.) Plaintiffs have since clarified that Thompson does not assert any Title IX claims against Sherrard individually. (Doc. 25 at 2 n.1.)

Thompson's rights under the First and Fourteenth Amendments of the U.S. Constitution pursuant to 42 U.S.C. § 1983 against Brister and Sherrard; and (3) violation of Thompson's right to privacy and confidentiality under Louisiana law against Sherrard. (*Amend. Compl.* ¶¶ 13–18, Doc. 16.)

Based on the claims asserted, Plaintiffs seek compensatory damages, punitive damages as to the individual defendant, attorney's fees, and all such other relief to which they are entitled. (*Id.* ¶¶ 1, 18–19.) Additionally, Henderson individually seeks damages for "loss of consortium, services, and society with her son," Thompson. (*Id.* ¶ 16.)

On March 23, 2022, the Court ruled on Defendants' *Motion to Dismiss Under Rule 12(b)(6)*, (Doc. 20), granting the motion in part and denying it in part. (*See* Doc. 39.) In short, the motion was granted with respect to Plaintiffs' claims for (1) discrimination in violation of Title IX based on deliberate indifference to sexual harassment against Southern, and (2) violation of Thompson's rights under the First and Fourteenth Amendments of the U.S. Constitution pursuant to 42 U.S.C. § 1983 against Brister and Sherrard. In all other respects, the motion was denied. (*Id.* at 1.)

In light of the Court's Ruling (Doc. 39), the two remaining claims before the Court are: (1) retaliation in violation of Title IX of the Educational Amendments of 1982, 20 U.S.C. § 1681, *et seq.*, against Southern Lab, and (2) violation of Thompson's right to privacy and confidentiality under Louisiana law against Sherrard. Moreover, the issue also remains before the Court as to whether Henderson is entitled to loss of consortium damages. Defendants filed the present *Motion for Summary Judgment* seeking dismissal of these claims. (Doc. 62-1 at 25.)

## II.    RULE 56 STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). "The movant bears the initial burden and must identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Pioneer Expl., L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted)).

However, "the movant 'need not *negate* the elements of the nonmovant's case.' " *Id.* (quoting *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc))). That is, "[a] movant for summary judgment need not set forth evidence when the nonmovant bears the burden of persuasion at trial." *Wease v. Ocwen Loan Servicing, L.L.C.*, 915 F.3d 987, 997 (5th Cir. 2019) (citing *Celotex*, 477 U.S. at 323 ("[W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim.")). "The moving party may meet its burden to demonstrate the absence of a genuine issue of material fact by pointing out that the record contains no support for the non-moving party's claim." *Id.* (citing *Stahl v. Novartis Pharms. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002)).

If the mover bears his burden of showing that there is no genuine issue of fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with 'specific facts showing that there is a *genuine issue* for trial.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (internal citations omitted). The non-mover's burden is not satisfied by "conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Little*, 37 F.3d at 1075 (citations and internal quotations omitted).

Ultimately, "where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (cleaned up). Further:

> In resolving the motion, the court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion.

*Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991) (citations omitted).

## III.  DISCUSSION

### A.  Evidentiary Objections

The parties raise various evidentiary objections in their briefing. First, Plaintiffs object to the consideration of Defendants' Exhibit 9, (Doc. 62-11), which are handwritten statements from students who witnessed the altercation between Thompson and Brown. (Doc. 71 at 14.) Plaintiffs argue that these statements are hearsay under Federal Rule of Evidence 801, and "none of the students testified or authored any affidavits attesting to his/her statements." (*Id.*) This Court has held that hearsay evidence may be considered in connection with a motion for summary judgment if it is "capable of being presented in a form that would be admissible in evidence [at trial]." *Barnett v. La. Dep't of Health*, No. 17-1793, 2023 WL 2467876, at *2 (M.D. La. Mar. 10, 2023) (deGravelles, J.) (internal quotations omitted) (quoting *LSR Consulting, LLC v. Wells Fargo Bank, N.A.*, 835 F.3d 530, 534 (5th Cir. 2016); Fed. R. Civ. P. 56(c)(2)). Finding that the authors of these statements can be called to testify at trial, the Court overrules this objection.

Further, as discussed below, Thompson and Henderson both testified that Sherrard told them she disclosed to D.M. that Thompson was the one who reported the students who made sexually harassing comments in the group text message. (*See* Deposition of Thompson, Doc. 71-2

at 119–20; Deposition of Henderson, Doc. 71-3 at 2–3.) Defendants argue that "[a] 'party's uncorroborated self-serving testimony cannot prevent summary judgment, particularly if the overwhelming evidence supports the opposite scenario.' " (Doc. 72 at 5 (quoting *Eagan v. Walgreen Co.*, No. 21-20352, 2022 WL 683636, at *3 (5th Cir. Mar. 8, 2022).) However, as this Court has previously explained:

> The fact that [a party's evidence] may be self-serving does not necessarily gainsay [its] truth.
>
> > "A party's own testimony is often 'self-serving,' but [a court] do[es] not exclude it as incompetent for that reason alone." Instead, testimony based on personal knowledge and containing factual assertions suffices to create a fact issue, even if it is self-serving. In fact, "characterizing a party's testimony as 'self-serving' is not useful to the court. In a lawsuit, where each party is attempting to advance his own cause and protect his own interests, we are scarcely shocked when a party produces evidence or gives testimony that is 'self-serving.' "
>
> *Hardy v. Wood Grp. PSN, Inc.*, No. 13-775, 2014 WL 1664236, at *3 (W.D. La. Apr. 25, 2014) (quoting *Dean v. Ford Motor Credit Co.*, 885 F.2d 300, 306 (5th Cir. 1989)) (other citation omitted).
>
> "As the Fifth Circuit has noted, '[i]f all "self-serving" testimony were excluded from trials, they would be short indeed.' " *Parkman v. W & T Offshore, Inc.*, 544 F. Supp. 3d 642, 650 (M.D. La. 2021) (deGravelles, J.) (quoting *C.R. Pittman Constr. Co., Inc. v. Nat'l Fire Ins. Co. of Hartford*, 453 F. App'x 439, 443 (5th Cir. 2011)).

*Barnett*, 2023 WL 2467876, at *3–4. Accordingly, Defendants' objection is overruled.

## B.  Title IX Retaliation

### 1.  *Parties' Arguments*

#### a.  Memo in Support (Doc. 62-1)

Defendants begin by arguing that Thompson must satisfy his burden of establishing a prima facie case of retaliation under Title IX and to do so "must direct the Court to record evidence such that a reasonable jury could find that (1) he engaged in a protected activity;

(2) he was subjected to an adverse action; and (3) a causal link exists between the protected activity and the adverse action." (Doc. 62-1 at 9.)

According to Defendants, Thompson's complaint to the school about other students' inappropriate comments in a private group text message does not amount to a protected activity under Title IX, as this is not an activity Title IX prohibits because it "does not prohibit private student misconduct." (*Id.* at 10.)

Moreover, Thompson did not suffer an adverse action. (*Id.*) Defendants argue that the evidence confirms that (1) "Brister did not falsely accuse Thompson of instigating the harassment"; (2) Southern Lab "did not invalidate Thompson's complaint"; (3) Southern Lab "did not expel Thompson from school" and instead had him finish the year virtually; and (4) "Sherrard did not disclose Thompson's identity as the complainant." (*Id.*)

However, even if Thompson suffered an adverse action, there were legitimate, non-retaliatory reasons for such actions. (*Id.* at 16.) Southern Lab had a legitimate, non-retaliatory reason to require Thompson to finish the year virtually because of the altercation between him and his teacher. (*Id.* at 16–18.) Likewise, if Southern Lab did disclose Thompson's identity, it had a legitimate, non-retaliatory reason in doing so, that being to investigate Thompson's complaint. (*Id.* at 18–19.) "It is a justified step to investigate Thompson's complaint, ascertain the perspective of the accused students, and dole out discipline." (*Id.* at 19.) As such, "[f]or students subject to a sanction of 10-days' suspension, due process is consistent with being told the basis of the allegations made against them, so they can confront, attack, and undermine the allegations of their accuser." (*Id.*)

Defendants conclude by arguing that "Thompson cannot show any causal link between either (1) his texting complaint in September or (2) alleged hallway bullying for four days in

October and (3) the discipline imposed after his altercation in Brown's classroom." (*Id.* at 20 (footnote omitted).)

b.  Opposition (Doc. 71)

Plaintiffs begin by asserting that the Court previously ruled at the motion to dismiss stage that Thompson's September 3, 2020 report to Southern Lab of the alleged sexual harassment via group text message constitutes a protected activity under Title IX. (Doc. 71 at 15 (citing Doc. 39 at 25–26).) Now, Plaintiffs argue, at the summary judgment stage, there is evidence to support this allegation, namely Thompson's, Sherrard's, and Asberry's deposition testimonies. (*Id.*) Plaintiffs also argue that Thompson's reports to Sherrard and Franklin sometime between October 5, 2020, and October 8, 2020 that he was being sexually harassed by the same group of students who were part of the group text message also constitutes a protected activity under Title IX. (*Id.* at 16.)

With regard to adverse action, Plaintiffs assert that the Court previously held that the following allegations constitute adverse actions: (1) Southern Lab expelling Thompson; (2) Brister falsely accusing Thompson of instigating the sexual harassment; and (3) "Sherrard disclosing that he complained of the group text harassment by speaking with one of the students involved and making that student's parents aware of their child's involvement in the incident." (*Id.* at 17.) Plaintiffs argue that all three of these allegations are supported by evidence. (*Id.* at 17–18.) Likewise, all three of these "adverse actions resulted in the deprivation of [Thompson]'s rights to an education free from retaliation." (*Id.* at 18.)

Plaintiffs then argue that "[c]ausation . . . is satisfied where there exists a sufficiently close timing between [a] protected activity and the . . . action without consideration of any other factors." (*Id.* (citing *Garcia v. Prof's Contract Servs.*, 938 F.3d 236, 241–43 (5th Cir. 2019)).) The Fifth Circuit in *Garcia* held that approximately two months was enough to establish a causal connection. (*Id.* (citing *Garcia*, 938 F.3d at 243).) In this case, the protected activity and retaliation was within

11

a two-month time frame, and thus causation is met. (*Id.* at 19.) Further, Defendants do not have

any legitimate, non-retaliatory reason for their retaliation, and as such, Plaintiffs have established

a prima facie case of Title IX retaliation. (*Id.*)

Plaintiffs conclude by arguing that there is pretext to which retaliatory animus may be

inferred in this case:

> Under Title VII jurisprudence, pretext may be shown either through evidence of
> disparate treatment or by showing that the employer's proffered explanation
> is false or unworthy of credence. Here, [Thompson] was falsely accused of
> instigating the sexual harassment, disclosed as the complainant in violation of Title
> IX, and expelled within one (1) month of his complaints to defendant SU about
> his peers sexually harassing him. This, coupled with defendant SU's
> shifting/false proffered reasons for adverse action and disparate treatment,
> demonstrates pretext from which retaliatory animus may be inferred.

(*Id.* (footnote omitted).)

### c.  Reply (Doc. 72)

In reply, Defendants begin by arguing that Thompson did not suffer an adverse action.

(Doc. 72 at 3–5.) First, Plaintiffs no longer assert that Thompson's complaint was invalidated

because it was not in writing, and thus this cannot constitute an adverse action. (*Id.* at 3.) With

respect to the alleged accusation that Thompson instigated the harassment, Defendants argue that

there is no evidence as to this. (*Id.*) Instead, Ms. Henderson's testimony that Plaintiffs rely on "was

that, in her view, asking whether Thompson might have a history with the students amounted to

accusing Thompson of instigating the incident." (*Id.* (emphasis omitted) (citing Deposition of

Henderson, Doc. 62-20 at 12–13).) Moreover, Thompson's alleged expulsion cannot be an adverse

action because there is no evidence that he was ever expelled. (*Id.* at 4.) Likewise, there is no

evidence that Sherrard disclosed Thompson's identity. (*Id.*) The only testimony that supports

Thompson and Henderson's theory that Sherrard told them that she disclosed Thompson's identity

to others is their own self-serving testimony. (*Id.* at 4–5.)

Defendants then argue that Plaintiffs cannot refute their legitimate, non-retaliatory reasons for their actions regarding Thompson and the discipline imposed against him. (*Id.*) Brister asking whether anything happened between Thompson and the other students prior to the group text message incident was in an effort to assess the situation, not to accuse Thompson of wrongdoing. (*Id.*) Further, Plaintiffs allege that Thompson was expelled, but the evidence proves that he was never expelled and was able to complete his education at Southern Lab. (*Id.*)

However, in the event virtual learning is considered an adverse action despite not being alleged in the complaint, "Thompson cannot show that his complaint about the September 2020 group text thread is the 'but-for' cause of the resulting discipline imposed on him." (*Id.* at 6.) The school had the authority to impose such a punishment, as it was more lenient than the maximum punishment for his actions, which was expulsion. (*Id.* at 7.) Likewise, the Court has previously concluded that it was rational for the school to impose a different punishment on Thompson for his actions than the one imposed on the students who were suspended for their participation in the group text message thread. (*Id.* at 8.)

Defendants end by arguing that Plaintiffs cannot create a genuine issue of material fact as to Thompson's identity being disclosed, and in the event that they can, they cannot refute Defendants' legitimate, non-retaliatory reason for doing so: investigation of Thompson's complaint. (*Id.* at 8–9.)

### 2. Applicable Law

The Supreme Court has held that Title IX's private right of action encompasses claims of retaliation "where the funding recipient retaliates against an individual because he has complained about sex discrimination." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 171 (2005); *see Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 170 (5th Cir. 2011) (citing

*Jackson*, 544 U.S. at 174) (A plaintiff bringing a Title IX retaliation claim "must show that the district or its representatives took an adverse action against her because she complained of harassment."). "To establish a *prima facie* case of retaliation under Title IX, a plaintiff must show that (1) he engaged in a protected activity; (2) he was subjected to an adverse employment action; and (3) 'a causal link exists between the protected activity and the adverse employment action.' " *Trudeau v. Univ. of N. Tex., By and Through its Bd. of Regents*, 861 F. App'x 604, 607–08 (5th Cir. 2021) (per curiam) (quoting *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014)); *see also Collins v. Jackson Pub. Sch. Dist.*, 609 F. App'x 792, 795 (5th Cir. 2015) (per curiam) ("The language of the anti-retaliation provision of Title IX and that of Title VII are similar and 'should be accorded a similar interpretation.' " (citation omitted)); *see also Doe #1 v. Bd. of Supervisors of La. State Univ. & Agric. & Mech. Coll.*, No. 21-564, 2022 WL 16701930, at *18 (M.D. La. Nov. 3, 2022) (explaining that "since *Jackson*, the Fifth Circuit and district courts therein have held repeatedly that Title VII standards apply in evaluating Title IX retaliation claims" (footnote omitted)).

"Retaliation claims under Title IX are analyzed using the same burden-shifting framework applicable to Title VII retaliation claims." *Minnis v. Bd. of Supervisors of La. State Univ. & Agric. & Mech. Coll.*, 55 F. Supp. 3d 864, 884 (M.D. La. 2014), *aff'd sub nom. Minnis v. Bd. of Supervisors of La. State Univ. & Agr. & Mech. Coll.*, 620 F. App'x 215 (5th Cir. 2015) (citations omitted). "[O]nce a plaintiff makes a prima facie showing of retaliation based on his assertion of a Title IX right, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for its action." *Id.* "Thereafter, the burden shifts back to the plaintiff to present evidence that the defendant's stated non-retaliatory reason is merely pretext for an impermissible motive or unlawful behavior." *Id.*

For retaliation claims under Title VII, "opposing" a practice made unlawful under Title VII only constitutes protected activity if the employer had some notice of both the employee's opposition and the discriminatory nature of the conduct being opposed. *See, e.g.*, *Allen v. Envirogreen Landscape Pros., Inc.*, 721 F. App'x 322, 326 (5th Cir. 2017), *as revised* (Dec. 7, 2017) (explaining that "[a] vague complaint or general allegation of unfair treatment, without any reference to an unlawful employment practice under Title VII, does not constitute protected activity"). A similar, if not the same, standard applies to retaliation claims under Title IX. *See Trudeau*, 861 F. App'x at 609 (discussing retaliation under Title IX and stating: "We have indeed held that there must be evidence that the decisionmakers had knowledge of his protected activity and that, absent such awareness, it cannot be said that the decisionmakers might have been retaliating against the plaintiff for having engaged in that activity.") (citation and internal quotations omitted).

Likewise, "an adverse employment action must be 'materially adverse,' such that it would 'dissuade[ ] a reasonable worker from making or supporting a charge of discrimination.' " *Williams v. Franciscan Missionaries of Our Lady Health Sys., Inc.*, No. 18-323, 2019 WL 1370871, at *5 (M.D. La. Mar. 26, 2019) (deGravelles, J.) (Title VII) (quoting *Burlington N. and Santa Fe. R.R. Co. v. White*, 548 U.S. 53, 68 (2006)).

The applicable causation standard at the initial prima facie stage calls for less than the "but-for" causation requirement. *Garcia*, 938 F.3d at 241–43 (discussing the Supreme Court's directive in *Univ. of Texas South Western Medical Center v. Nassar*, 570 U.S. 338 (2013) that Title VII retaliation claims must be proven according to traditional principles of but-for causation, but clarifying that "*Nassar*'s heightened but-for causation requirement applies *only* in the third step (the pretext stage) of the *McDonnell Douglas* framework" and not at the prima facie stage of the

retaliation analysis (emphasis added)); *see Young v. City of Phila. Police Dep't*, 651 F. App'x 90, 96–97 (3d Cir. 2016) (same) (citation omitted); *see also Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 251 (4th Cir. 2015) (same) (citation omitted). "At the prima facie case, a plaintiff can meet his burden of causation simply by showing close enough timing between his protected activity and his adverse employment action." *Garcia*, 938 F.3d at 243. Granted, "[f]or temporal proximity to alone establish prima facie causation, it is required to be 'very close.' " *Wallace v. Seton Fam. of Hosps.*, 777 F. App'x 83, 91 (5th Cir. 2019) (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (listing cases)); *see also Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 808 (5th Cir. 2007) (citation omitted).

For example, in *Garcia*, the Fifth Circuit found that the plaintiff established the causation prong for purposes of his prima facie case based solely on the two-and-a-half-month gap in time between the protected activity and adverse action. 938 F.3d at 243. In determining whether this temporal proximity was close enough to establish a causal connection, the Fifth Circuit explained:

> This court has previously held that a period of two months is close enough to show a causal connection. *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 994–95 (5th Cir. 2005). We have even suggested that four months is close enough. *Evans v. Cty. Of Houston*, 246 F.3d 344, 354 (5th Cir. 2001). The Supreme Court has since approvingly cited a case that held three months was insufficient to show causation. *See Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001). But Garcia's two-and-one-half-month period still fits comfortably within the time periods of both our case law and *Breeden* to establish causation. Accordingly, the district court erred in holding that Garcia failed to establish his prima facie case.

*Id.* Yet, in a different case, the Fifth Circuit concluded that "two and one-half months between the protected activity and the adverse employment decision, standing alone, [was] not within the 'very close' proximity that is necessary to establish causation." *Besser v. Tex. Gen. Land Off.*, 834 F. App'x 876, 885 (5th Cir. 2020).

16

3.    *Analysis*

   a.   Have Plaintiffs Put on a Prima Facie Case of Retaliation Under Title
        IX?

Again, to succeed in putting on a prima facie case of retaliation under Title IX, Plaintiffs

must put on evidence of (1) a protected activity; (2) an adverse action; and (3) a causal relationship

between the protected activity and the adverse action. *See, e.g.*, *Trudeau*, 861 F. App'x at 607–08.

In short, the Court finds that Plaintiffs have succeeded in putting on their prima facie case.

                        i.    *Protected Activity*

With respect to protected activity, Plaintiffs claim Thompson engaged in protected activity

in two ways: (1) by reporting the alleged sexual harassment in the form of cyberbullying to

Southern Lab on September 3, 2020; and (2) by reporting to Sherrard and Franklin sometime

between October 5, 2020, and October 8, 2020 that he was being sexually harassed while on

campus by the same group of students who were part of the group text message. (Doc. 71 at 15–

16.)

The evidence is clear, and the parties seem to agree to the fact, that Thompson brought the

text thread to Southern Lab's attention on September 3, 2020. (*See* DSUMP, Doc. 62-2 at 1, ⁋ 5;

POSDMF, Doc. 71-1 at 3, ⁋ 5.) Though Defendants argue that "Thompson's September 2020

complaint about student texts in a private setting does not amount to a protected activity under

Title IX[,]" (*see* Doc. 62-1 at 10), the Court previously held at the motion to dismiss stage that

such activity is protected under Title IX, (*see* Doc. 39 at 26).

For the same reasons that the Court found that Thompson's reports of off-campus sexual

harassment constituted a protected activity under Title IX, the Court now finds Thompson's report

of on-campus sexual harassment to constitute a protected activity under Title IX. (*See id.*; *see also*

*Trudeau*, 861 F. App'x at 609 (discussing retaliation under Title IX and stating: "We have indeed

17

held that there must be evidence that the decisionmakers had knowledge of his protected activity and that, absent such awareness, it cannot be said that the decisionmakers might have been retaliating against the plaintiff for having engaged in that activity.") (citation and internal quotations omitted).) Moreover, Plaintiffs have put on evidence that such a protected activity occurred. (*See* Deposition of Thompson, Doc. 71-2 at 17, 21, 116–18 (discussing the on-campus sexual harassment and Thompson reporting such to Sherrard and Franklin).)

Therefore, the Court finds that Plaintiffs have made a prima facie showing of protected activities under Title IX through the two above-mentioned reports of sexual harassment.

*ii.    Adverse Action*

As Plaintiffs correctly note in their opposition to Defendants' *Motion for Summary Judgment*, the Court ruled at the motion to dismiss stage that the following activities constitute an adverse action under Title IX: (1) expulsion; (2) Brister falsely accusing Thompson of instigating the sexual harassment; and (3) Sherrard disclosing Thompson's identity as complainant. (*See* Doc. 39 at 26–29; Doc. 71 at 17.) The question now before the Court is whether Plaintiffs have met their burden of producing evidence that these events did in fact occur.

First, Plaintiffs argue that Thompson was "expelled" from Southern Lab by way of "prohibiting him from returning to in-person learning, forc[ing] him to learn virtually for the rest of his tenure at [Southern] Lab, bann[ing] him from campus, and prohibit[ing] him from participating in senior activities . . . ." (Doc. 71 at 17.) Defendants argue that "Thompson was not expelled" and instead "was enrolled to complete the year virtually, participated in commencement ceremonies, graduated in May 2021, earned numerous accolades from both teachers and students, and enrolled at Tulane University on scholarship." (Doc. 62-1 at 12.)

Despite receiving a Diploma from Southern Lab and thereafter beginning his college education at Tulane University, the Court finds that Plaintiffs have produced evidence that Thompson was expelled from Southern Lab. At the time Thompson was a student, Southern Lab defined "expulsion" as "the removal or banning of a student from school for an extensive period of time due to a student habitually violating rules, or for a single offen[s]e of appropriate severity in extreme cases." (*See* Doc. 71-4 at 70.) Through being required to complete the year virtually and not being allowed to return to campus, Thompson was "remov[ed] . . . from school for an extensive period of time due to . . . a single offen[s]e of appropriate severity . . . ." (*Id.*) The Court recognizes that there may be a question of fact as to whether Thompson's punishment constitutes an expulsion, as the school's final recommendation clearly says "Expulsion is not recommended." (*See* Doc. 62-17.) Regardless, the punishment that was imposed on Thompson is one that "a reasonable [student] would have found [to be] materially adverse, which in this context means it well might have dissuaded a reasonable [student] from making or supporting a charge of [sexual harassment]." *Burlington*, 548 U.S. at 68 (internal quotation marks and citations omitted). Therefore, the Court finds Plaintiffs have met their burden of production as to this issue.

Second, Plaintiffs argue that Thompson and Henderson both testified that Brister accused Thompson of instigating the sexual harassment by way of inquiring whether Thompson did anything to warrant the sexual harassment. (Doc. 71 at 17.) Thompson testified that Brister communicated to him "that he felt [Thompson] instigated the . . . comments" through what Brister told Thompson's mother, Henderson. (*See* Deposition of Thompson, Doc. 71-2 at 118–19.) Henderson testified that Brister accusing Thompson of instigating the sexual harassment is "a fact." (Deposition of Henderson, Doc. 71-3 at 11.)  However, when asked if Brister personally told this to Henderson, Henderson responded: "No. He asked me personally: Did [Thompson] say or

do something to cause them to send those text messages? And I believe, in my e-mail, I responded and even stated that: You asked as if did he do something to bring this on himself." (*Id.* at 11–12.) Henderson was then asked: "[T]o be clear, if . . . Brister asked you if [Thompson] did anything to bring this on, that, in your mind, is blaming him for it or – that's accusing him of instigating it, the mere fact that [Brister] asked about it?" (*Id.* at 12.) In response, Henderson stated: "I would – I can agree to that. Yes." (*Id.*)

Though this issue is dependent on Henderson's interpretation of Brister's comment, again, at the summary judgment stage, "the court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes" and instead must determine whether "the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor." *Int'l Shortstop, Inc.*, 939 F.2d at 1263. When viewing all inferences in Plaintiffs' favor, reasonable jurors could interpret Brister's statements the way in which Henderson did. As such, the Court finds that Plaintiffs have put on a prima facie showing as to this issue.

Lastly, with regard to Sherrard disclosing Thompson's identity as complainant, Thompson and Henderson both testified that Sherrard told them she disclosed to D.M. that Thompson was the complainant. (*See* Deposition of Thompson, Doc. 71-2 at 119–20; Deposition of Henderson, Doc. 71-3 at 2–3.) As such, the Court finds that Plaintiffs have met their burden as to this issue as well.

Therefore, the Court finds that Plaintiffs have put on a prima facie showing of all three alleged adverse actions.

*iii.    Causation*

Again, to make a prima facie showing of causation, Plaintiffs need not prove "but-for" causation but instead "can meet [their] burden of causation simply by showing close enough timing between [Thompson's] protected activity and [the] adverse . . . action[s]." *Garcia*, 938 F.3d at 243. As explained in the Court's *Ruling on Defendants' Motion to Dismiss*, (Doc. 39 at 29–32), the Fifth Circuit in *Garcia* found that two and a half months satisfied temporal proximity, and in this case, the alleged protected activities and adverse actions all occurred well within a two-and-a-half-month timespan. Specifically, these events began on September 3, 2020, when Thompson brought the text thread to Southern Lab's attention, (*see* DSUMP, Doc. 62-2 at 1, ⁋ 5; POSDMF, Doc. 71-1 at 3, ⁋ 5), and culminated on October 26, 2020, when Southern Lab completed the paperwork with the recommendation for Thompson's punishment, (*see* Doc. 62-17). As such, the Court finds that Plaintiffs have satisfied causation and thus have put on a prima facie case of retaliation under Title IX.

b.    <u>Do Defendants have legitimate, non-retaliatory reasons for their actions?</u>

Finding that Plaintiffs have put on their prima facie case, the burden now turns to the Defendants to prove that they had legitimate, non-retaliatory reasons for their actions. *Minnis*, 55 F. Supp. 3d at 884. "If the plaintiff makes a prima facie showing, the burden then shifts to [Southern Lab] to articulate a legitimate, nondiscriminatory or nonretaliatory reason for its . . . action. [Southern Lab's] burden is only one of production, not persuasion, and involves no credibility assessment." *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007) (citations omitted), *abrogated on other grounds by Hamilton v. Dallas Cnty.*, 79 F.4th 494 (5th Cir. 2023).

Regarding Thompson's expulsion, Defendants argue that they had a legitimate, non-retaliatory reason for doing so because Thompson had physically threated Brown. (Doc. 62-1 at

21

17.) The Court finds this to be a legitimate, non-retaliatory reason for expelling Thompson. Under the clear terms of the school's handbook, the recommended punishment for "[a]ssualt and [b]attery on a [f]aculty or [s]chool [p]ersonnel" is expulsion. (*See* Doc. 62-23 at 2.) Even if Thompson's punishment is considered something less than expulsion, as explained below in the context of pretext, this is of no consequence. Further, if the Court were to read the handbook as Plaintiffs intend that expulsion is the exclusive punishment for assault and battery on a teacher, then in the event the school were to think expulsion is not the necessary or appropriate punishment to implement, then no punishment could be implemented for the student's action. Such an interpretation is nonsensical. Therefore, Southern Lab had a legitimate, non-retaliatory reason for expelling Thompson.

With respect to Brister's alleged accusations against Thompson, Defendants assert that Brister had a legitimate, non-retaliatory reason for inquiring whether Thompson made any comments prior to the sexual harassment in the text message thread, that being to determine if anything happened with other students prior to the incident. (*See* Doc. 62-1 at 11; Doc. 72 at 5.) However, Defendants have pointed to no evidence to support this theory. As such, the Court cannot find that Defendants have met their burden of production on this issues, and thus cannot conclude that Defendants have come forth with a legitimate, non-retaliatory reason for Brister's alleged accusations against Thompson.

Nor can Defendants put forth a legitimate, non-retaliatory reason for Sherrard's alleged disclosure of Thompson as complainant. Defendants argue that Sherrard was warranted in such an act because "[u]nder Title IX and Louisiana law, disclosure of a complainant's identity may be necessary to investigate." (Doc. 62-1 at 18–19 (citing 34 C.F.R. § 106.71(a); 34 C.F.R. § 106.45(b)(2)(i)(B); La. R.S. § 17:416(c)(ii)(aa)).) While 34 C.F.R. § 106.71(a) does make an

exception for the disclosure of a complainant's identity "to carry out the purposes of 34 CFR part 106, including the conduct of any investigation[,]" disclosing Thompson's identity as complainant would not have aided in any investigatory efforts. Southern Lab was aware of the text messages and had documentary proof of who was involved in the incident. Disclosing Thompson's identity as a participant in the group text message to other students who were also in the group text message perhaps could have aided in investigation, as it may have provided those students context and reminded them of the events that occurred. However, such is not the case with disclosing Thompson's identity as the complainant. In essence, the Court sees a distinction between "You participated in a group text message that involved Thompson" and "Thompson reported you because of your participation in a group text message that involved him." Therefore, the Court does not find investigation to be a legitimate reason for the disclosure of Thompson's identity as complainant.

Further, the Court is not persuaded by Defendants' argument that 34 C.F.R. § 106.45(b)(2)(i)(B) and La. R.S. § 17:416(c)(ii)(aa) provide for the disclosure of Thompson's identity as complainant. 34 C.F.R. § 106.45(b)(2)(i)(B) discusses "identities of the parties involved[,]" and La. R.S. § 17:416(c)(ii)(aa) contemplates disclosing to an accused student the basis of the accusations against them. The Court does not read these to encompass the disclosure of a Title IX complainant.

Therefore, Defendants' only legitimate, non-retaliatory reason for their actions is that of Thompson's expulsion. As such, summary judgment is denied as to Defendants' alleged adverse actions of (1) Brister falsely accusing Thompson of instigating the sexual harassment; and (2) Sherrard disclosing Thompson's identity as complainant.

c.  Pretext

Finding that Defendants have set forth a legitimate, non-retaliatory reason for Thompson's

expulsion, the burden now shifts back to Plaintiffs. "The ultimate determination in an unlawful

retaliation case is whether the conduct protected by Title VII was a 'but for' cause of the adverse

employment decision." *Saketkoo v. Adm'rs of Tulane Educ. Fund*, 31 F.4th 990, 1001 (5th Cir.

2022) (quoting *Long*, 88 F.3d at 305 n.4); *see also Owens v. Circassia Pharms., Inc.*, 33 F.4th 814,

835 (5th Cir. 2022). "Because [Defendants have] carried [their] burden of production, this court

turns to whether [Plaintiffs] can prove [their] claim according to traditional principles of 'but for'

causation and carry [their] burden of demonstrating that [Defendants'] proffered non-

discriminatory reason is pretextual." *Saketkoo*, 31 F.4th at 1002.

> An employee can establish pretext in the context of retaliation by showing that a discriminatory motive more likely motivated her employer's decision. In order to survive a motion for summary judgment, the plaintiff must show a conflict in substantial evidence on this issue. At this juncture, we consider numerous factors, including the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered.
>
> There will be cases where a plaintiff has [ ] established a prima facie case . . . yet no rational factfinder could conclude that the action was discriminatory.

*Id.* (cleaned up).

> This inquiry requires a greater showing than mere causal connection. It requires that the plaintiff show that protected conduct was *the* reason for the adverse action. In other words, even if a plaintiff's protected conduct is a substantial element in a defendant's decision to terminate an employee, no liability for unlawful retaliation arises if the employee would have been terminated even in the absence of the protected conduct. Plaintiffs may combine suspicious timing with other significant evidence of pretext to survive summary judgment . . . .

*Owens*, 33 F.4th at 835 (cleaned up).

As addressed above, there is temporal proximity to establish a causal connection between

Thompson's reports and his expulsion. However, Plaintiffs must now establish that Thompson's

reports were the reason he was expelled. *See id.* Phrased another way, would Southern Lab have expelled Thompson even if he would not have made his reports of sexual harassment? The Court finds the answer to be yes.

Again, under the clear terms of the school's handbook, the recommended punishment for the "major" infraction of "[a]ssualt and [b]attery on a [f]aculty or [s]chool [p]ersonnel" is expulsion. (*See* Doc. 62-23.) There is a question of fact as to whether Thompson's imposed punishment constitutes "expulsion," as it seems to meet the handbook's definition of "expulsion," but expulsion was not the disciplinary committee's recommended punishment. (*Compare* Doc. 71-4 at 70 ("expulsion" being defined as "the removal or banning of a student from school for an extensive period of time due to a student habitually violating rules, or for a single offen[s]e of appropriate severity in extreme cases") *with* Doc. 62-17 (the school's final recommendation being: "Expulsion is not recommended").) Yet, whether Thompson's punishment is considered expulsion or something lesser is of no consequence.

The evidence is clear that Defendants did have the authority to expel Thompson for his actions. Plaintiffs attempt to show pretext by arguing that there are questions of fact as to whether Southern Lab had the authority to impose virtual learning as a punishment on Thompson. (*See* Doc. 71 at 20–21.) Though a question of fact, this fact is immaterial. It is commonsensical that if Southern Lab were to impose a lesser punishment than the maximum punishment it was allowed to give, such a decision would be to Thompson's benefit. Defendants imposing a lesser punishment than required, whether they had the authority to impose that punishment or not, is not evidence that Defendants' action was "more likely motivated" by "a discriminatory motive." *Saketkoo*, 31 F.4th at 1002. Rather, it is evidence of the opposite.

Plaintiffs then attempt to establish pretext by arguing that Southern Lab "did not comply with its [h]andbook when expelling [Thompson] and forcing the unauthorized conditions on him." (Doc. 71 at 20.) Again, whether Southern Lab had the authority to impose virtual learning on Thompson is of no consequence because it did have the authority to impose expulsion as per the clear terms of the handbook. Further, Plaintiffs raise arguments as to whether Defendants followed the proper expulsion procedures set forth in the handbook. The Court does not find merit in these arguments either but addresses them briefly.

Plaintiffs first argue that Thompson's disciplinary hearing was required to be held ten days from when he was removed from school. (*Id.*; *see also* Doc. 71-4 at 71.) However, as per the handbook, this is only so "unless an alternate date is agreed upon by all parties." (Doc. 71-4 at 71.) Plaintiffs have put on no evidence that an alternative date was not agreed to by the parties.

Plaintiffs then attempt to argue that "an expulsion hearing is limited to the question of whether [Thompson] was 'guilty' of the allegations related to the incident with Mr. Brown or not. [Southern] Lab's [h]andbook did not afford [Southern] Lab the authority to ban [Thompson] from campus and force him to attend school virtually." (Doc. 71 at 20.) However, this is not necessarily true. As the handbook explains:

> If the findings and disposition of the expulsion hearing are made at the conclusion of the hearing, the Director or his/her designee shall inform the parents and the student of the findings and disposition of the case. In any event, the Director or his/her designee shall mail (certified mail, return receipt requested), or hand to the parents no later than five days after the hearing, a written notification of the findings *and what action will be taken*.

(Doc. 71-4 at 71–72 (emphasis added).) Given this, the Court does not read the handbook to limit an expulsion hearing to only the question of whether a student is guilty.

Plaintiffs lastly argue that Southern Lab failed to follow Page 46, Section 3(A)–(K) of the handbook by "not obtain[ing] concurrence from Mr. Brown or the 'building level committee'

before forcing [Thompson] to attend school virtually or impos[ing] any of the other penalties on him." (Doc. 71 at 20.) However, the Court does not read Page 46, Section 3(A)–(K) to apply to Thompson's punishment of continuing the school year virtually. This section applies to students who have been removed from the classroom, and subsections (A)–(K) apply to what an "administrator shall implement" "prior to *readmission* of the student to the classroom." (*See* Doc. 71-4 at 82 (emphasis added).) Since Thompson's punishment did not involve readmission to the classroom, Plaintiffs' argument that the school failed to comply with Page 46, Section 3(A)–(K) in implementing this punishment is without merit.

Plaintiffs' final argument as to pretext is that Thompson received a harsher penalty than the students who sexually harassed him, despite those students also committing a "major" infraction under the school's student handbook. While "Bullying/Cyberbullying/Intimidation, Harassment & Hazing" is considered a "major" infraction under Southern Lab's student handbook, the handbook clearly states that the punishment for such an infraction is "Short or Long-Term suspension, or recommended expulsion." (Doc. 62-23 at 2.) Therefore, Plaintiffs' argument that Thompson received a more severe punishment than those similarly situated to him fails, as the students who were suspended for their comments in the group text message committed a different offense than Thompson did, which had a different punishment than Thompson's offense, despite both offenses being considered "major."

For these reasons, the Court finds that Plaintiffs have failed to establish pretext with respect to Thompson's expulsion. As such, summary judgment as to Defendants' alleged adverse action of Thompson's expulsion is granted.

### C.  State Law Invasion of Privacy

#### 1.   *Parties' Arguments*

##### a.   Memo in Support (Doc. 62-1)

Defendants argue that Plaintiffs' invasion of privacy claim fails as well because it "is a narrow tort with limited avenues." (*Id.* at 21.) "To be actionable, Thompson must show that Sherrard's conduct was unjustified[,] and it caused a serious interference with Thompson's privacy interest." (*Id.* (footnote omitted).) Even though Plaintiffs cannot show Sherrard disclosed Thompson's identity, in the event Plaintiffs could prove so, they "cannot show that a single disclosure of his identity was a 'public' disclosure of an 'embarrassing private fact' and was so unjustified and unreasonable to be legally actionable." (*Id.*) Moreover, Plaintiffs' claim also fails because they cannot prove that "Sherrard's alleged disclosure *caused* a serious interference with [Thompson's] privacy interest." (*Id.* at 22.) Likewise, they cannot show that such an interference was serious. (*Id.*)

##### b.   Opposition (Doc. 71)

In opposition, Plaintiffs argue that Thompson's sexual harassment report "was confidential, protected, and private under FERPA and Title IX." (Doc. 71 at 23.) Sherrard was not justified in disclosing Thompson's identity under the law, and this invasion of Thompson's privacy was serious because he received threats from D.M. in response to her finding out Thompson made his report. (*Id.*) Plaintiffs also argue no one knew Thompson was the complainant until Sherrard disclosed his identity. (*Id.*) "Anyone who knew about the sexually harassing comments could have reported them to Sherrard before she confirmed he was the 'rat' to [Thompson's] sexual harasser and his sexual harasser's mother." (*Id.*)

c.  Reply (Doc. 72)

In reply, Defendants argue that "any FERPA and Title IX confidentiality requirements are subject to an exception when an alleged victim files a grievance, permitting disclosure of the identities of parties involved while investigating." (Doc. 72 at 9.) As to causation, since Thompson said before leaving the group text message that he "call[s] out the enemy," it is implausible to assert that she only knew his identity as complainant after Sherrard's alleged disclosure. (*Id.*) Further, the alleged disclosure did not cause a serious interference. (*Id.*) "[Plaintiffs] allege[] that D.M. tried to Facetime and text [Thompson], but [they do] not identity what the alleged 'threat' was, and [Plaintiffs do] not dispute that after ignoring her call, [Thompson] was never contacted by her again." (*Id.* at 9–10.) Lastly, Defendants argue that the alleged disclosure was not of a private or embarrassing fact. (*Id.* at 10.) "Thompson concedes calling people out for harassing him. His texting took place in a group of twenty-one students, and he 'call[ed] out the enemy.' So it was not private or embarrassing that Thompson was upset and called his bullies out." (*Id.* (footnotes omitted).)

2.  *Applicable Law*

When presented with a Louisiana tort law claim, "[o]ur task is to determine as best we can how the Louisiana Supreme Court would decide it." *Jorge-Chavelas v. La. Farm Bureau Cas. Ins. Co.*, 917 F.3d 847, 850 (5th Cir. 2019) (cleaned up). Because of Louisiana's civilian tradition, "Louisiana's 'Constitution, codes, and statutes' are of paramount importance to its judges." *Id.* at 851 (quoting *Am. Int'l Specialty Lines Ins. Co. v. Canal Indem. Co.*, 352 F.3d 254, 260 (5th Cir. 2003)).

> Unlike stare decisis, which can flow from one decision, in the civil system numerous court decisions must agree on a legal issue to establish *jurisprudence constante* (French for constant jurisprudence). And even when that consensus exists

in the caselaw, it remains only persuasive authority for the *Erie* guess; "we are not strictly bound" by the decisions of Louisiana's intermediate courts.

*Id.*

Louisiana tort law recognizes an action for invasion of one's right to privacy in certain circumstances. As another section of this Court has explained:

> Louisiana courts have allowed tort actions for invasion of privacy which involves the basic right of a person to be let alone in his private affairs. An unwarranted invasion of a person's right of privacy may give rise to liability for the resulting harm. The determination of whether a person's conduct constitutes the tort of invasion of privacy depends upon the facts and circumstances of each case. The right of privacy embraces four different interests, each of which may be invaded in a distinct fashion: (1) the appropriation of an individual's name or likeness for the use or benefit of the defendant; (2) an unreasonable intrusion by the defendant upon the plaintiff's physical solitude or seclusion; (3) publicity that unreasonably places the plaintiff in a false light before the public; and (4) unreasonable public disclosure of embarrassing private facts.

*Walker-Jones v. La. Ass'n of Educators*, No. 15-584, 2016 WL 1169473, at *2 (M.D. La. Mar. 22, 2016) (Dick, C.J.) (citations and footnotes omitted).

As the Court acknowledged, however, recognition of such a claim in Louisiana has its limits:

> Louisiana courts have also distinguished actionable from non-actionable invasions. To be actionable, a defendant's conduct must be unreasonable and must seriously interfere with the plaintiff's privacy interest. It is not necessary to prove that the defendant acted with malicious intent. The reasonableness of the defendant's acts is determined by balancing the interests of the plaintiff in protecting his privacy from serious invasions with the defendant's interest in pursuing his course of conduct. Where the defendant's action is properly authorized or *justified by circumstances*, it is deemed reasonable and non-actionable, even though it admits to a slight invasion of the plaintiff's privacy.

*Id.* (footnotes and citations omitted) (emphasis added).

### 3.   Analysis

Here, Plaintiffs assert that Sherrard's disclosure of Thompson's identity to one of his alleged harassers constituted an unreasonable disclosure of embarrassing private facts. Again, to

have an actionable claim for invasion of Thompson's privacy, Plaintiffs' allegations must plausibly show that Sherrard's conduct: (1) was unreasonable, and (2) seriously interfered with Thompson's privacy interest. *Id.* However, as addressed above, there is a genuine issue of material fact as to whether Sherrard's conduct of disclosing Thompson's identity as complainant even occurred. (*Compare* Deposition of Thompson, Doc. 71-2 at 119–20; Deposition of Henderson, Doc. 71-3 at 2–3 *with* Deposition of Sherrard, Doc. 62-5 at 11.) Even if it did occur, there are still questions of material fact as to (1) whether the disclosure was so unreasonable as to be legally actionable, and (2) the seriousness of the interference. Finding such, the Court must deny summary judgment as to this issue.

### D.  Loss of Consortium, Services, and Society

Henderson has alleged damages, including those "for loss of consortium, services, and society with her son" as a result of the alleged actions taken against her son. (*Amend. Compl.* ¶ 16, Doc. 16.) Defendants argue that this claim should be dismissed for the same reasons that Thompson's above-discussed claims should be dismissed, as it is derivative of and dependent on those claims. (Doc. 62-1 at 23.) As explained above, Thompson's Title IX claim for retaliation and state law claim for invasion of privacy survive summary judgment. Thus, because Thompson still has viable claims, Defendants' argument with respect to this issue fails.

However, Defendants also argue that Plaintiffs have failed to put forth evidence to succeed in their loss of consortium claim. According to Defendants, to succeed in a loss of consortium claim in Louisiana, Plaintiffs must satisfy the following elements with regard to Henderson's loss:

> (1) society, including general companionship, affection, sexual relations; (2) support, which is lost family income that would go to support the uninjured party; and, (3) service, which is the uncompensated work around the house or educational help, which presumably will have to be obtained from another source for a price as a result of the injury.

(*Id.* at 24 (citing *Thibodeaux v. Bernard*, 2000-72 (La. Ct. App. 3 Cir. 11/2/00); 772 So. 2d 897, 904).) With respect to support, Defendants argue that since Thompson did not contribute financially to the home, Henderson has not suffered a loss of support. (*Id.*) Thompson testified that before and after the accident he was only expected to keep his room clean, so as to service, there was no loss because he provided no financial assistance and "continued to do the same uncompensated work around the house as he did before . . . ." (*Id.*) Lastly, Henderson cannot satisfy society because Thompson testified that he did not spend much time with his mom, within a few months of the incident he moved out of town for college, and after the alleged disclosure of his identity he continued to excel in school. (*Id.* at 24–25.)

However, Plaintiffs contend that there is evidence to the contrary:

> Here, the evidence shows Ms. Henderson's relationship with [Thompson] was negatively affected as a result of defendants' unlawful conduct. Ms. Henderson testified in great detail as to her relationship with [Thompson] prior to the incidents sued upon herein, including that he used to share everything with her and they enjoyed hobbies together, including exercise such as jogging, HIT (high intensity training) workouts, and participate in 5K's. Ms. Henderson confirmed she and her son bonded together through enjoying ice cream, shopping, eating at restaurants, "jok[ing] a lot", taking trips to New Orleans for his acting classes, and cooking in the home. After [Thompson] was retaliated against and identity unlawfully disseminated, [Thompson] became more reserved and not as forthcoming with Ms. Henderson as he had been. In addition, [Thompson] and Ms. Hende[r]son no longer enjoy the aforementioned hobbies as they previously did. Ms. Henderson no longer accompanies [Thompson] to New Orleans for his acting classes or cooks with him because he no longer participates in those activities. Ms. Henderson confirmed she bonds less with [Thompson] than she did before and classifies the environment in her home as still emotionally "dark".

(Doc. 71 at 24.)

"Loss of consortium in the context of the parent/child relationship means loss of the aid, assistance and companionship of the child, or loss of affection, society and service." *Spears on Behalf of Spears v. Jefferson Par. Sch. Bd.*, 94-352 (La. Ct. App. 5 Cir. 11/16/94); 646 So. 2d 1104, 1107; *see also Turner v. Lyons*, 2003-0186 (La. Ct. App. 4 Cir. 1/28/04); 867 So. 2d 13, 21.

> Civil Code art. 2315 gives parents a cause of action for loss of consortium when their child is injured by the fault of another. Parents must prove, by a preponderance of the evidence, any one or more of the following: (1) loss of love and affection, (2) loss of society and companionship, (3) loss of performance of material services, (4) loss of financial support, (5) loss of aid and assistance, and/or (6) loss of fidelity.

> A child may sustain physical injury without necessarily causing his parents a loss of consortium. Mental anguish suffered by the parents because of an injury to their child is not compensable in a loss of consortium claim.

*Mitchell v. Roy*, 2010-563 (La. Ct. App. 3 Cir. 11/3/10); 51 So. 3d 153, 167 (quoting *Morrison v. Kappa Alpha Psi Fraternity*, 31,805 (La. Ct. App. 2 Cir. 5/7/99); 738 So. 2d 1105, 1122). *See also Spears on Behalf of Spears*, 646 So. 2d 1104, 1107 (affirming parents' loss of consortium damages when "injuries incurred by the child rendered the family life difficult afterward since [the child] no longer wished to go on family outings").

The Court finds that that Henderson's testimony creates genuine issues of material fact as to her loss of society and companionship. While Thompson testified that he "never really spent time with . . . [his] mom[,]" (Deposition of Thompson, Doc. 62-6 at 3), Henderson testified to the fact that she and her son "used to go and do a lot of jogging[,]" "do HITT[,]" and "go around to different 5Ks[,]" (Deposition of Henderson, Doc. 71-3 at 18–19). However, "[Thompson] didn't want to do much of anything after [the incident]." (*Id.* at 19.) Further, they "used to have ice cream[,]" "go to the mall[,]" and "do things . . . ." (*Id.*) Henderson testified that the two "still have a good bond, but it's definitely not the same." (*Id.* at 20.) Considering the genuine issues of material fact these testimonies create, the Court finds that Defendants' *Motion for Summary Judgment* as to this issue is denied.

IV.   CONCLUSION

Accordingly,

**IT IS SO ORDERED** that *Defendants' Motion for Summary Judgment*, (Doc. 62), filed by Defendants the Board of Supervisors of Southern University and A&M College and Renita Sherrard is **GRANTED IN PART AND DENIED IN PART**. Defendants' *Motion for Summary Judgment* is **GRANTED** with respect to the issue of there being a legitimate, non-retaliatory reason for Thompson's expulsion. In all other respects, Defendants' Motion is **DENIED**.

Signed in Baton Rouge, Louisiana, on June 26, 2024.


**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**